UNITED RURAL ELECTRIC MEMBER-
SHIP CORPORATION, Jay County Rural Electric Membership Corporation, Whitley County Rural Electric Membership Corporation, Indiana Statewide Association of Rural Electric Cooperatives, Inc., Wabash Valley Power Association, Inc., and Paulding–Putnam Electric Cooperative, Inc., Appellants,

v.

INDIANA & MICHIGAN ELECTRIC COMPANY, General Motors Corporation, City of Bluffton, Indiana, City of Columbia City, Indiana, Town of South Whitley, Indiana, Town of Warren, Indiana, City of Fort Wayne, Indiana, County of Allen, State of Indiana, the Greater Fort Wayne Area Chamber of Commerce, UAW and the Utility Consumer Counselor of the State of Indiana, Appellees.

No. 93S02–9002–EX–99.

Supreme Court of Indiana.

Feb. 6, 1990.

David S. Richey, Parr, Richey, Obremskey & Morton, Indianapolis, Stanley H. Matheny, Matheny, Michael, Hahn & Bailey, Huntington, for appellants.

Don F. Morton, Carol Sparks Drake, Parr, Richey, Obremskey & Morton, Wabash Valley Power Ass'n, Indianapolis, for appellant-intervenor.

Milford M. Miller and Edward J. Liptak, Livingston, Dildine, Haynie & Yoder, Fort Wayne, John F. Wickes, Jr., Scopelitis, Garvin & Wickes, Indianapolis, Langdon D. Bell and Judith B. Sanders, Bell & Bentine Co., L.P.A., Columbus, Ohio, for appellees.

SHEPARD, Chief Justice.

We must decide whether the Indiana Utility Regulatory Commission[1] properly exercised its statutory authority in the boundary dispute between United Rural Electric Membership Corporation and Indiana & Michigan Electric Company. We hold that the commission exceeded its authority.

Appellant United REMC is a cooperative engaged in the retail sale of electricity in various counties in northern Indiana.[2] Appellee Indiana & Michigan Electric Company is an investor-owned utility also serving portions of northern Indiana. United is appealing a March 27, 1985, decision by the Utility Regulatory Commission,[3] which modified I & M's service area to include a 960–acre site that belongs to General Motors Corporation.

## I. *History*

In 1980, the Indiana General Assembly created a detailed procedure by which the commission was directed to draw boundaries for electricity service areas. Ind. Code §§ 8–1–2.3–1 to –6 (West 1982) (Electricity Suppliers' Service Area Assignments). Pursuant to this statutory mandate, United and I & M filed a joint petition of agreement on June 28, 1982, proposing their respective service territories. This joint proposal placed the currently disputed territory of 960 acres within United's service area. It is undisputed that United had always served this 960–acre site. When the joint petition was filed, United was serving 24 relatively small customers in the area. The commission conducted a public hearing concerning the joint petition on September 1, 1983, but never entered an order approving or disapproving it.

In the spring of 1984, General Motors began acquiring property for construction of a truck assembly plant. After an initial meeting with United on July 17, 1984, General Motors had a final meeting with United on August 28, 1984, and on that same day announced its preference that I & M serve its electrical needs. Also on that same day, I & M filed a "Petition for Modification," seeking to modify the assignment of the GM property to place it within I & M's service area. I & M argued that General Motors preferred that I & M serve the truck plant and that I & M was better qualified than United to provide electrical service to such a mammoth operation.[4] The commission conducted hearings on I & M's petition to modify on October 29, 30, 31 and November 5 and 7, 1984. On December 10, 1984, the commission granted the petition and, by a 3–2 vote, issued an interim order assigning the GM property to I & M.

United REMC sought judicial review of the commission's order. In the meantime, GM proceeded to construct the plant and produced the first truck there in December 1986.[5] Thereafter, the Court of Appeals

---

**1.** This administrative agency was formerly known as the "Public Service Commission of Indiana." Ind.Code § 8–1–1–7 (West Supp. 1989).

**2.** Indiana's rural electric cooperatives, owned by the rural consumers, were created by the Indiana REMC Act in 1935. The bill was the first of its kind in the country. E. Born, Power to the People: A history of rural electrification in Indiana 2–4 (1985).

**3.** The commission also issued an interim order on December 10, 1984, to which the Court of Appeals opinion refers. *See United Rural Elec. Membership Corp. v. Indiana & Michigan Elec. Co.* (1987), Ind.App., 515 N.E.2d 1135. The slip opinion was issued later. *See In the Matter of* *the Assignment of Electricity Suppliers Serv. Areas Pursuant to Public Law 69–1980,* No. 36299–S–209(X) (Ind.Util. Regulatory Comm'n March 27, 1985) (LEXIS, Ind. library, Inpuc file).

**4.** The GM plant was the largest economic development project in the history of northeast Indiana, if not all of Indiana, according to Richard G. Clark, president and chief executive officer of the Greater Fort Wayne Chamber of Commerce. He stated that the plant would create 3,000 jobs. Record at 1898.

**5.** "High-tech plant at Fort Wayne a GM showcase," Indianapolis Star, July 2, 1987, at 37 (The $500 million plant was formally dedicated on July 1, 1987).

affirmed the commission's order. *United Rural Electric Membership Corp. v. Indiana & Michigan Elec. Co.* (1987), Ind. App., 515 N.E.2d 1135. We grant transfer.

## II. *Discussion*

United asserts that the commission exceeded its statutory authority by receiving, considering and granting I & M's petition to modify. United raises eight issues; we conclude that one is dispositive of the case.

 The manner by which Indiana's electrical utilities are regulated is largely in the hands of the legislature. The Utility Regulatory Commission, which was created by the General Assembly, is primarily a fact-finding body with the technical expertise to administer the regulatory scheme devised by the legislature. *Johnson County Rural Elec. Membership Corp. v. Public Serv. Co. of Indiana* (1978), 177 Ind. App. 53, 378 N.E.2d 1; *Decatur County Rural Elec. Membership Corp. v. Public Serv. Co. of Indiana* (1971), 150 Ind.App. 193, 275 N.E.2d 857. The commission can only exercise power conferred upon it by statute. *General Telephone Co. of Indiana v. Indiana Pub. Serv. Comm'n.* (1958), 238 Ind. 646, 655, 150 N.E.2d 891, 894, *reh'g denied*, 238 Ind. 646, 154 N.E.2d 372. The corollary to that rule is that in interpreting statutory authority granted to a public utility commission, any doubt about such authority must be resolved against the existence of such authority. *See Chicago & E.I.R. Co. v. Public Serv. Comm'n.* (1943), 221 Ind. 592, 594, 49 N.E.2d 341, 342.

The legislation at the heart of this dispute emerged from a long history of boundary disputes between the rural cooperatives and investor-owned utilities. The original REMC Act passed in 1935 did not afford any protection to REMC territory. As a result, REMC territory was subject to eminent domain by privately owned utilities. These boundary disputes created constant litigation. Before the 1980 legislation, as many as 51 separate boundary disputes were pending in this state's judicial system. Record at 2616–17. The purpose of the 1980 act, Pub.L. No. 69, was to draw permanent boundaries and eliminate the endless and numerous disputes over service areas.[6] Both the REMCs and the investor-owned utilities supported the legislation.[7]

The original legislation mandated that electric suppliers *"shall* on or before July 1, 1982" file their petitions and boundary maps with the commission. Act approved Feb. 28, 1980, Pub.L. No. 69, 1980 Ind.Acts 742, 744 (emphasis added). In 1982, the legislature amended the statutory deadline by stating "... or on such other date as the commission may determine, but *in any*

---

**6.** Legislative Findings and Declaration of Policy. It is declared to be in the public interest that, in order to encourage the orderly development of coordinated statewide electric service at retail, to eliminate or avoid unnecessary duplication of electric utility facilities, to prevent the waste of material and resources, and to promote economical, efficient, and adequate electric service to the public, the currently unincorporated areas of Indiana shall be divided into designated geographic areas within which an assigned electricity supplier has the sole right to furnish retail electric service to customers. Ind.Code § 8–1–2.3–1 (West 1982).

**7.** "Representatives of Indiana's REMCs, investor-owned utilities, Municipal Electric Association (IMEA) and bill sponsors participated in the ceremonial signing of S.B. 76 marking the end to more than 15 years of legal and legislative battles to obtain secure service territories for Indiana's REMCs." *The Cover—Electric industry celebrates territory protection,* Indiana Rural News: The Rural Electric Magazine, April, 1980, at 2.

"On March 1, 1980, Indiana's rural electric cooperatives 'at last secured service territories in which they can plan, build and provide dependable electric service to their members without fear of loss of members, facilities and territory to other utilities by condemnation.

"The 1980 Indiana General Assembly passed and Governor Otis Bowen signed into law Senate Bill 76 which will begin a new era for Indiana's rural electric cooperatives. The legislation was supported by the Indiana Electric Association (representing the five investor-owned companies) and the Indiana Municipal Electric Association (representing more than 70 municipally-owned electric systems). The bill passed 49–0 in the Senate and 86–8 in the House of Representatives....

"Passage of S.B. 76 ends many years of bitter struggle and 'bloody' and expensive court and legislative battles." *A New Era for Rural Electric Cooperatives,* Indiana Rural News: The Rural Electric Magazine, March, 1980, at 4.

*event* on or before March 1, 1983." Act approved Feb. 25, 1982, Pub.L. No. 71, 1982 Ind.Acts 574, 575 (codified at Ind.Code § 8–1–2.3–3) (emphasis added).

Enactment of the service area legislation prompted the filing of 178 petitions before the commission, which declared processing of these petitions "an enormous task."[8] Notwithstanding this burden, the 1982 amendment demonstrated that the General Assembly was determined that the task be completed under specific deadlines.

Discerning whether the legislature intended these deadlines to be mandatory or directory and whether the legislature considered time to be essential to this statute is crucial to resolving this case.

■ When the word "shall" appears in a statute, it is construed as mandatory rather than directory unless it appears clear from the context or the purpose of the statute that the legislature intended a different meaning. *State ex rel. City of Indianapolis v. Brennan* (1952), 231 Ind. 492, 109 N.E.2d 409.[9] On one occasion when this Court interpreted a statute containing "shall" to be directory rather than mandatory, we stated:

> In construing the statute before us we must be mindful that the intent of the legislature controls. In this situation our judicial function is best discharged by an honest and earnest desire to ascertain and effectuate that intent. *State v. Gilbert* (1966), 247 Ind. 544, 219 N.E.2d 892. The meaning and intention of the legislature are to be ascertained not only from the phraseology of the statute but also by considering its design, its nature and the consequences that flow from the various interpretations.

*Allen County Dept. of Pub. Welfare v. Ball Memorial Hosp. Ass'n.* (1969), 253 Ind. 179, 184, 252 N.E.2d 424, 427 (statute stating that a hospital "shall within seventy-two hours" report the admission of an

indigent to the county welfare department). Analysis of Ind.Code §§ 8–1–2.3–1 to –6 under the standard of *Brennan* and *Ball Memorial* leads us to conclude that the commission was without statutory authority to receive, consider, or grant a petition to modify. Our judgment about the power the legislature intended to grant the commission is derived from the precise step-by-step nature of Ind.Code §§ 8–1–2.3–1 to –6 and its focus on a definite time limitation. The presumption that statutory time deadlines are mandatory and the rule that any doubts about statutory power for a public utility commission are resolved against the commission prevail in this case.

■ The proceeding to define the service area boundary between United and I & M commenced in accordance with this statute's step-by-step process. The United/I & M joint petition was filed on June 28, 1982, within the statutory time limits of Ind.Code § 8–1–2.3–3(f). The commission properly conducted a public hearing on the proposal on September 1, 1983. The first lapse occurred when the commission failed to comply with the statutory mandate that it "shall issue an order within twelve (12) months of the filing of the petition and related maps." Next, I & M filed its petition to modify on August 28, 1984. The statute does not provide for such a petition, nor was I & M within any imaginable statutory time limit for filing any kind of petition.

■ Consequently, to resolve this issue in favor of the commission's order, we must find not only that the statutory time limit for a commission order was merely directory, but also that the time limit for filing a petition, which the legislature enacted twice, was merely directory. We would also have to find that I & M's petition to modify, which is not provided for by the statute either explicitly or implicitly and was filed after any imaginable deadline, was still within the legislative intent

---

**8.** *In the Matter of the Assignment of Electricity Suppliers Service Areas Pursuant to Public Law 69–1980,* No. 36299–S–209(X), slip op. at 1.

**9.** The manual which guided Indiana's drafters of legislation when the 1980 act was adopted

provided: "A duty or obligation is best expressed by 'shall' (in a mandatory sense); a power or privilege by 'may' (in a permissive sense)." Legislative Services Agency, Form and Style Manual for Legislative Measures (1977).

of Ind.Code §§ 8–1–2.3–1 to –6. Accepting these conclusions is impossible. It is apparent that the General Assembly's objective in enacting the service area legislation was to bring these perennial disputes to a prompt finale. Permitting such disputes to be initiated and litigated after the deadlines provided is contrary to that objective.

I & M argues that the statute could legitimately be construed as failing to provide any explicit method for determining the boundaries when the time limitations lapse and the commission acts upon a petition without a statutory basis. This asserted lack of any explicit consequences would support the argument that the time limitations are merely directory. *Hancock County Rural Elec. Membership Corp. v. City of Greenfield* (1986), Ind.App., 494 N.E.2d 1294.

We conclude, however, that Ind.Code § 8–1–2.3–3(d) is a valid and ready provision to apply when the parties involved in this process fail to act within the deadlines; it states:

> Until otherwise agreed upon between electricity suppliers or ordered by the commission under section 3(g) of this chapter, the boundaries of the assigned service area for each adjacent electricity supplier outside existing electric distribution lines and the nearest existing electric distribution lines of any other electricity supplier; the resulting assigned service area outside existing municipal limits of an electricity supplier will be that area which is closer to the existing

electric distribution lines of a supplier than to the existing electric distribution lines of any other electricity supplier.

Certainly, it is far more legitimate to interpret this provision as the method for setting boundaries when deadlines lapse than to find *any* statutory provision for petitions to modify.[10] I & M also argues that this is a case like *Ball Memorial* which calls for continuing administrative action notwithstanding failure to comply with legislative deadlines. We distinguish *Ball Memorial* on several grounds. First, in this case several time limits were ignored rather than the single deadline that was delared merely directory in *Ball*. Second, these time limits were repeatedly addressed by the legislature and are an integral part of the statute's goal. Third, this case involved a type of petition not provided for by the statute. Fourth, while the hospital in *Ball Memorial* asserted it could not practically meet the 72–hour time limitation if, for example, a patient remained unconscious for that period of time, the commission and I & M fail to assert any practical reasons for why these deadlines could not be met. I & M fails to overcome the presumption that the term "shall" is mandatory.

### III. *Conclusion*

The commission's receipt, consideration, and grant of I & M's petition to modify was void for lack of statutory authority. Because the commission failed to issue an order on the original petition of agreement

---

**10.** We think the concise analysis by Commissioner Zagrovich, who dissented from the Commission's order, is well taken:

> The boundary between I & M and the United REMC was approved and signed (Facet V–8–1) by the Parties on four different occasions: January 11, 1983, July 18, 1983, September 20, 1983 and June 8, 1984. The boundary between United REMC and I & M was the same on all four occasions, and was never disputed until August 29, 1984. The Order indicates that the assigned territory didn't exist. I naturally disagree with that opinion because of the facts stated above.
> The site of the General Motors Plant is within the assigned service area of United REMC. Therefore, United REMC has the exclusive right to serve GM unless the Commission finds that United REMC is not providing ade-

quate service or that it could not provide service to GM.

> The issue or questions is not I & M as compared to United REMC. According to testimony at the hearing, GM believes that I & M would be a better electric supplier for them tha[n] (sic) United REMC. If this is what they desired, then GM should have picked a site in I & M's assigned service area for its plant, which is just across I–69 from the present site. It is not the job of this Commission to pick an electric supplier.

*In the Matter of the Assignment of Electricity Suppliers Service Areas Pursuant to Public Law 69–1980,* No. 36299–S–209(X), slip op. at 36 (Ind.Util.Regulatory Comm'n Dec. 10, 1984) (LEXIS, Ind. library, Inpuc file) (Zagrovich, Comm'r, dissenting).

between the parties, Ind.Code § 8–1–2.3–3(d) governs this boundary dispute by default.

We vacate the commission's order assigning the disputed territory to I & M and remand to the commission for entry of further orders consistent with this opinion.

DeBRULER, GIVAN, PIVARNIK and DICKSON, JJ., concur.