Thomas R. ROMINE, and Margaret F. Romine, Appellants–Defendants,

v.

James W. GAGLE, and Nancy S. Gagle, Appellees–Plaintiffs.

No. 48A04–0202–CV–66.

Court of Appeals of Indiana.

Jan. 14, 2003.

Rehearing Denied March 10, 2003.

James E. Freeman, Jr., Sansberry Dickmann Freeman & Builta, Anderson, IN, Attorney for Appellants.

Patrick R. Ragains, Smith & Ragains (Not a Partnership), Anderson, IN, Attorney for Appellees.

## OPINION

FRIEDLANDER, Judge.

Thomas and Margaret Romine own property that abuts property owned by James and Nancy Gagle. The Romines brought in truckloads of fill dirt and raised the elevation of a certain portion of their land such that, according to the Gagles, water no longer drained from the Gagles' property. The Gagles filed suit against

the Romines. The Romines appeal from the subsequent judgment of the court awarding the Gagles compensatory and punitive damages, as well as granting an injunction and an easement requested by the Gagles. The Romines present the following consolidated, restated issues for review:

1. Did the trial court err in concluding that that water flowing from the Gagles' property was a natural surface watercourse, as opposed to surface water?

2. Did the trial court err in concluding that the placement of the dam violated Ind.Code Ann. § 36–9–27.4, et seq.?

3. Did the trial court err in awarding compensatory damages?

4. Did the trial court err in awarding punitive damages?

5. Did the trial court err in awarding a prescriptive easement in favor of the Gagles?

We affirm in part, reverse in part, and remand.

The facts favorable to the judgment are that the Gagles purchased a house and property in 1988 in Madison County, Indiana. They purchased the house from Betty Bol, who built the house sometime in 1979. The Romines owned the adjoining property on the south side of the Gagles' property. A shallow ditch ran from the Gagles' property across the Romines' property, crossing the boundary line common to the two properties. After a rainfall, water would collect in the ditch and run south from the Gagles' property to the Romines' property, and then into a nearby drain, called the Andrew J. Jones drain. On July 10, 21, and 24, 1997, the Romines dumped approximately fifty dump-truck loads of dirt on their property at the location (hereinafter referred to as "the watershed area") where the accumulated groundwater ran from the Gagles' property across the Romines' property. The effect of the fill dirt was to raise the level of the watershed area by approximately three feet and create what amounted to a dam. After rain fell the following April, the Gagles' yard flooded because the rainwater could not drain from the Gagles' property. The Gagles had standing water in their yard for the next forty-eight days. Thereafter, the Gagles' property would flood whenever it rained heavily.

On August 11, 1998, the Gagles file a Complaint for Injunction, Abatement of Nuisance[,] Establish Permanent Easement, and Damages. The Gagles alleged that "a certain well-defined and natural watercourse," *Appellant's Appendix* at 9, ran from the Gagles' property across the Romines' property. They alleged that there was a platted utility and drainage easement running along the northern boundary of the Romines' property. Finally, the Gagles alleged that the Romines had "willfully, intentionally, and wrongfully obstructed said watercourse and said easement with fill material preventing the natural drainage from Plaintiffs' real estate across defendants' real estate." *Id.* On December 6, 2001, following a bench trial, the trial court entered the following relevant findings of fact and conclusions of law:

3. That along the entire south side of defendants' real estate is a platted easement reserved for drainage and utilities.

4. That traversing from a point along the north side of plaintiffs' real estate and over, upon and across the platted easement on defendants' real estate and continuing over, upon and across defendants' real estate in a southerly and westerly direction to an outlet pipe under Acacia Drive, a private mutual road, is a natural

surface watercourse having a well defined direction.

5. That defendants have placed and currently maintain a dirt berm and dirt fill obstruction over, across and in said mutual surface watercourse and easement.

6. That the placement and maintenance of said dirt fill and berm or any obstruction in said natural surface watercourse is in violation of the Indiana Drainage Code, I.C. § 36–9–27.4–3.

7. That for more than twenty (20) years plaintiffs and their predecessors in title have actually, openly, notoriously, continuously, hostility [sic] and adversely drained their real estate by and through said natural surface watercourse and easement.

8. That in addition to the Indiana law prohibiting obstruction of said natural surface watercourse, plaintiffs have acquired the prescriptive right to drain their real estate through said natural surface watercourse and over and across defendants' real estate.

9. That defendants' actions in placing and maintaining said obstruction in said natural surface watercourse and easement are and will continue to be injurious to the plaintiffs' health and the public health and is an obstruction that essentially interferes with the comfortable enjoyment of the life or property of and by plaintiffs, and is a nuisance.

10. That defendants willfully, intentionally, and wrongfully obstructed and continue to obstruct said natural surface watercourse and easement.

11. That said obdurate and egregious conduct of defendants and said obstruction has caused plaintiffs and their real estate substantial and peculiar injury and damages, which are of a continuing nature.

12. That plaintiffs have no appropriate remedy at law in view of said continuing substantial and peculiar injury and damages and in view of the fact that current Indiana drainage law only provides for the removal of such obstruction and does not enjoin reintroduction of such obstruction.

13. That plaintiffs are entitled to an injunction ordering defendants to forthwith remove all dirt and obstructions from said platted easement and from said natural surface watercourse and easement to the level of the natural contours of the land and permanently ordering and enjoining defendants and their successors from at any time in any manner obstructing said natural surface watercourse, drain and easement with dirt or any other matter and to maintain said natural surface watercourse, drain and easement to the level of the natural contours of the land as shown in the Ward topographical map in evidence herein as Plaintiffs' Exhibit 4.

14. That plaintiffs have incurred substantial expenses in attorney fees, expert witness costs and trial costs plus a $10,000.00 diminution in the value of their real estate as a direct result of defendants [sic] wrongful, willful and egregious conduct and are entitled to compensatory and punitive damages in addition to permanent injunction.

*Appellant's Appendix* at 18–20. Further facts will be set forth where necessary.

1.

The Romines contend that the trial court erred in concluding that the

watershed area constituted a "natural surface watercourse" within the meaning of Ind.Code Ann. § 36–9–27.4–3 (West, PREMISE through 2001 1st Special Sess.). When reviewing a judgment accompanied by findings and conclusions issued pursuant to Indiana Trial Rule 52(A), we apply a two-tiered standard to review. *Oil Supply Co., Inc. v. Hires Parts Serv., Inc.*, 726 N.E.2d 246 (Ind.2000). We examine the record to determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Garling v. Indiana Dep't of Natural Res.*, 766 N.E.2d 409 (Ind.Ct. App.2002), *trans. denied.* "[W]e disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment." *Oil Supply Co. v. Hires Parts Serv., Inc.*, 726 N.E.2d at 248. In conducting this review, we consider only the evidence favorable to the judgment, without reweighing that evidence. Therefore, it is clear that the challenger's burden is a heavy one, but one that may be overcome by a showing that the trial court's findings are clearly erroneous. *Id.*

■ The particular clearly erroneous standard that is to be employed depends upon whether the appealing party appeals a negative or an adverse judgment. *Garling v. Indiana Dep't of Natural Res.*, 766 N.E.2d 409. A negative judgment is one that was entered against a party bearing the burden of proof; an adverse judgment is one that was entered against a party defending on a given question, i.e., one that did not bear the burden of proof. *Id.* In the instant case, the trial court entered findings in favor of the Gagles, who in this case had the burden of proof. Accordingly, the Romines appeal an adverse judgment. When the trial court enters findings in favor of the party bearing the burden of proof, the findings are clearly

erroneous if they are not supported by substantial evidence of probative value. *Id.* Moreover, we will reverse such a judgment even where we find substantial supporting evidence, if we are left with a definite and firm conviction a mistake has been made. *Id.*

■ One critical determination that the trial court was required to make in issuing its ruling was the nature of the watercourse that ran through the watershed area. In order to consider this question, we must first examine several events that occurred prior to those set out in the preceding section, and which also culminated in a lawsuit between the parties to this appeal. On September 22, 1992, the Romines filed a complaint against the Gagles. In that action, the Romines complained that the Gagles used tile and ditching to divert rainwater away from the immediate area of their house to a lower part of their property. As a part of that strategy, the Gagles also constructed a ditch that drained a standing pond on an adjacent parcel of land, which was owned by a third party. The Romines alleged that the ditch "traverse[d] a *water course through* the same low areas on [the Romines'] property in the aforesaid described manner, likewise *causing excessive water to be channeled onto [the Romines'] prop*erty[.]" *Appellant's Appendix* at 2 (emphasis in original). The Gagles ultimately moved for summary judgment in that action, and the motion was granted. In granting the Gagles' motion, the trial court characterized the standing water of which the Romines complained as "surface water." *Id.* at 4. That determination led the court to rule in the Gagles' favor because Indiana continues to adhere to the "common-enemy doctrine," pursuant to which "it is not unlawful to accelerate or increase the flow surface water by limit-

ing, or eliminating ground absorption or changing the grade of the land." *Id.*

Returning now to the instant case, the Romines contend that the holding in the previous case, to the effect that the water in question that accumulated on the Romines' and the Gagles' respective properties was surface water, represents the law of the case on that question. Therefore, the argument goes, the trial court erred in the instant case in holding that the ditch that was blocked by the Romines' earthwork represents a natural watercourse.

 The "law of the case" doctrine "is a discretionary doctrine that is implicated when a litigant asks a court to revisit an earlier decision of its own in a collateral appeal of that decision and expresses the practice of courts generally to refuse to reopen what has been decided." *Hopkins v. State*, 769 N.E.2d 702, 706 (Ind.Ct.App. 2002). Specifically, "[t]he law-of-the-case doctrine provides that an appellate court's determination of a legal issue binds both the trial court and the court on appeal in any subsequent appeal involving the same case and substantially the same facts." *Luhnow v. Horn*, 760 N.E.2d 621, 625 (Ind.Ct.App.2001).

██ Granted, the 1992 lawsuit that was filed by the Romines involved the same parties that oppose each other in the instant case, and also involved the general subject of ground water. The salient facts and the questions presented in the earlier case, however, differ significantly from those of the instant case. In short, the instant case and the 1992 lawsuit are not the same action, nor does the latter case involve any issues that were decided in the prior proceeding. Therefore, the "law of the case" doctrine has no application here.

The broad issue of whether the Gagles should prevail was dependent to a large extent upon the resolution of this threshold issue: How was the watershed area to be classified with respect to the water that flowed through there after a rainfall? In filing their complaint, the Gagles invoked in substance the provisions of Ind.Code Ann. § 36–9–27.4, et seq., (West, PREMISE through 2002 1st Special Sess.) (the Drainage Obstruction Act), although they did not cite to those provisions in their complaint. I.C. § 36–9–27.4–14 (West 1997) provides,

If, after a hearing held under this chapter, the drainage board finds that:

(1) the obstruction of a drain or a natural surface watercourse that is alleged in the petition exists; and

(2) the removal of the obstruction will:

(A) promote better drainage of the petitioner's land; and

(B) not cause unreasonable damage to the land of the respondents;

the drainage board shall find for the petitioner.

"Natural surface watercourse" in this context is defined as, "an area of the surface of the ground over which water from falling rain or melting snow occasionally and temporarily flows in a definable direction and channel." I.C. § 36–9–27.4–3 (West, PREMISE through 2002 1st Special Sess.). The trial court determined that the Romines' landscaping efforts blocked a natural surface watercourse, within the meaning of I.C. § 36–9–27.4–3. The Romines assail that ruling on multiple grounds. First, they contend that the Gagles' action invoked the provisions of the Drainage Obstruction Act, which is intended to apply only to matters filed before county drainage boards. The Romines complain that the Gagles were obliged to pursue their action first before the Madison County Drainage Board, and that the matter could not properly be taken before a trial court until those administrative

remedies were exhausted. Second, the Romines contend that, even assuming the provisions of the Drainage Obstruction Act do apply, the court's ruling did not make the requisite finding that groundwater runoff flows through the watershed area in a "channel," as provided in I.C. § 36–9–27.4–3. Finally, the Romines contend that the court's ruling was erroneous because it contravened the common-enemy doctrine.

We first address the argument that the Gagles were not permitted to file a lawsuit in a trial court until they pursued an action under the Drainage Obstruction Act before the Madison County Drainage Board. We can find no case that discusses this question. Therefore, we turn to the provisions of the Drainage Obstruction Act to ascertain whether the legislature intended that it be the exclusive means of first resort for disputes of the sort involved here. The Drainage Obstruction Act was promulgated in 1996. Prior to its enactment, the common-law pertaining to such disputes favored the landowner who constructed the obstruction, as opposed to the landowner who complained about the obstruction. As long ago as 1878, our supreme court articulated this principle as follows:

> The right of an owner of land to occupy and improve it in such manner and for such purposes as he may see fit, either by changing the surface or the erection of buildings or other structures thereon, is not restricted or modified by the fact that his own land is so situated with reference to that of adjoining owner that an alteration in the mode of its improve-

ment or occupation in any portion of it will cause water, which may accumulate thereon by rains and snows falling on it surface, or flowing onto it over the surface of adjacent lots, either to stand in unusual quantities on other adjacent lands, or pass into or over the same in greater quantities or in other directions than they were accustomed to flow.... The obstruction of surface water or an alteration in the flow of it affords no cause of action in [sic] behalf of a person who may suffer loss or detriment therefrom against one who does no act inconsistent with the due exercise of dominion over his own soil.[1]

*Taylor v. Fickas,* 64 Ind. 167, 173 (1878) (quoting *Gannon v. Hargadon,* 92 Mass. 106, 10 Allen 106). It appears that, over time, the principle or an approximate derivation thereof became known generally as "the common-enemy doctrine," to wit:

> In its most simplistic and pure form the rule known as the "common enemy doctrine," declares that surface water which does not flow in defined channels is a common enemy and that each landowner may deal with it in such manner as best suits his own convenience. Such sanctioned dealings include walling it out, walling it in and diverting or accelerating its flow by any means whatever.

*Argyelan v. Haviland,* 435 N.E.2d 973, 975 (Ind.1982). Therefore, under the common-law as it existed prior to the enactment of the Drainage Obstruction Act, the outcome of a dispute over the construction of an obstruction depended upon the nature of

---

1. The supreme court amplified upon the extent of the landowners' rights in this regard as follows:

 And in respect to the running off of surface water caused by rain or snow, I know of no principle which will prevent the owner of land from filling up the wet and marshy places on his own soil for its amelioration

 and his own advantage, because his neighbor's land is so situated as to be incommoded by it. Such a doctrine would militate against the well[-]settled rule that the owner of land has full dominion over the whole space above and below the surface.

 *Taylor v. Fickas,* 64 Ind. at 174 (quoting *Goodale v. Tuttle,* 29 N.Y. 459 (1864)).

water whose course it altered. If the water in question was mere surface water, the common enemy doctrine would allow property owners to go so far as to completely wall it in, even if that would result in the nearby owners being either completely deprived of the use and enjoyment of the water, or of being inundated by it. *Trowbridge v. Torabi*, 693 N.E.2d 622 (Ind.Ct.App.1998), *trans. denied.* The common enemy doctrine protects those who erect obstructions only where the obstruction affects surface water. *Id.* On the other hand, if the water in question constitutes a pond or a natural watercourse, the common enemy doctrine would not apply. *Id.*

Our research leads us to conclude that the Drainage Obstruction Act adds to the substantive common-law primarily in that it permits complaining parties to seek redress for a dispute, not only in state superior and circuit courts, but also before the appropriate county drainage board.[2] Viewed against this historical backdrop, it appears that the Drainage Obstruction Act did not so much change the common-law as it created an alternative forum for deciding such disputes. As reviewed above, the common-law developed two alternate outcomes, one favoring the obstruction builder (where the common enemy doctrine applies), the other favoring the complaining neighbor (where the court found a natural watercourse or pond was involved). It appears that the Drainage Obstruction Act addresses and expands upon the law as it developed in the latter circumstance.

 It is well established that when the legislature has provided a statutory scheme with an exclusive administrative remedy, our courts lack jurisdiction to hear the matter until the administrative procedures have been exhausted or re-

quest for relief has been denied. *State v. Sproles*, 672 N.E.2d 1353 (Ind.1996). Exclusivity may be determined by examining the provisions of the statute in question. Typically, the expression of exclusivity will come in either of two forms. Some statutes will affirmatively state that its provisions constitute the exclusive remedy for such actions. *See, e.g.,* Ind.Code Ann. § 2-3-2-6 (West, PREMISE through 2002 1st Special Sess.) ("[t]he rights and remedies granted to an employee subject to I.C. § 22-3-2 through I.C. § 22-3-6 on account of personal injury or death by accident shall exclude all other rights and remedies . . . at common law or otherwise"). In others, the statute provides that judicial review is available only after the remedies provided in the statute are exhausted. *See e.g.,* Ind.Code Ann. § 4-21.5-5-4 (West 2002) ("[a] person may file a petition for judicial review under this chapter only after exhausting all administrative remedies available within the agency whose action is being challenged and within any other agency authorized to exercise administrative review").

 The interpretation of a statute is a question of law reserved for the courts. We review such questions under a de novo standard and owe no deference to a trial court's legal conclusions. A statute whose language is clear and unambiguous is not subject to judicial interpretation. *Dierckman v. Area Planning Com'n of Franklin County, Ind.,* 752 N.E.2d 99 (Ind.Ct.App.2001), *trans. denied.*

 "When the word 'shall' appears in a statute, it is construed as mandatory rather than directory unless it appears clear from the context or the purpose of the statute that the legislature intended a different meaning." *State, Indiana Civil*

---

**2.** The Drainage Obstruction Act also created certain procedural requirements, as well as

defined the damages that may be recovered in the event the petition is granted.

*Rights Com'n v. Indianapolis Newspapers, Inc.*, 716 N.E.2d 943, 947 (Ind.1999) (quoting *United Rural Elec. Membership Corp. v. Indiana & Michigan Elec. Co.*, 549 N.E.2d 1019, 1022 (Ind.1990)). The term "must" carries with it the same meaning. *See City of Muncie v. Lowe*, 705 N.E.2d 528 (Ind.Ct.App.1999) (construing Ind.Code Ann. § 36–4–3–4(f) (West, PREMISE through 2002 1st Special Sess.)), *trans. denied.*

Upon examining the provisions of the Drainage Obstruction Act, we find no indication in the Act that it is intended to provide the *only* recourse for parties pursuing claims of this nature. There are no provisions such as those examples set out above. In fact, the only provision relevant to the point indicates that an action before a county review board is discretionary, and not mandatory. I.C. § 36–9–27.4–9 provides that "a person seeking the removal of the obstruction *may* file a petition under" the Drainage Obstruction Act. [Emphasis supplied.] The term "may" in a statute ordinarily implies a permissive condition and a grant of discretion. *Schoemer v. Hanes & Assoc., Inc.*, 693 N.E.2d 1333 (Ind.Ct.App.1998). The Romines have not offered any persuasive argument to justify a departure from that usual rule of construction. *See, Williams v. City of Indianapolis Dept. of Public Works*, 558 N.E.2d 884 (Ind.Ct.App.1990), *trans. denied.* Therefore, we hold that, rather than requiring complainants to first file actions under the Drainage Obstruction Act prior to commencing an action in a trial court, the Drainage Obstruction Act clearly makes the choice of forum a matter of the petitioner's discretion.[3]

As a corollary to the aforementioned argument, the Romines appear to contend that the provisions of the Drainage Obstruction Act are intended to apply only to proceedings before county drainage boards, and not actions filed in trial courts. Specifically, the Romines contend that the Gagles cannot "benefit from the use of the definition of natural surface watercourses I.C. 36–9–27.4–3[sic] without complying with the requirements of I.C. 36–9–27.4–1et sec [sic]." *Brief of Appellant* at 11. As indicated previously, the definition set out in I.C. § 36–9–27.4–3 is "an area of the surface of the ground over which water from falling rain or melting snow occasionally and temporarily flows in a definable direction and channel." Under the common-law as it existed before the adoption of the Drainage Obstruction Act, a party could not erect an obstruction that interfered with the flow of a natural watercourse, which was defined as follows:

> [A] course or channel consisting of well defined banks and a bottom through which water flows in a definite direction for a substantial period each year. The size of the watercourse is immaterial as is the necessity of a constant water flow. It is sufficient that water from heavy rains is regularly discharged through a well defined channel in order to constitute a natural watercourse.

*Trowbridge v. Torabi*, 693 N.E.2d at 628 (quoting *Gasway v. Lalen*, 526 N.E.2d 1199, 1201 (Ind.Ct.App.1988)). The two definitions (i.e., common-law and statutory) are similar enough that the determination

---

**3.** We note here that a strict reading of the Drainage Obstruction Act would appear to leave the Gagles without a right to judicial review in the event that they received an unfavorable judgment from the county drainage board. Section 23 provides for judicial review under only the following circumstance: "If the drainage board finds for the petitioner after a hearing ... *a respondent* may file an action in the circuit or superior court of the county in the which alleged obstruction exists...." [Emphasis supplied.] In this action, the Gagles are petitioners, not respondents.

would often produce identical results, regardless of which definition is used. Moreover, to the extent that they differ, we are hard-pressed to identify a rationale for requiring trial courts to apply one, while at the same time permitting county drainage boards to apply a different one. This is especially so where, as here, the county drainage board's determination may be appealed to the trial court. On balance, then, we are inclined to view the definition of more recent origin set out in the Drainage Obstruction Act as the preferred definition—at least in the view of the Legislature. In any event, the trial court did not err in citing the definition set out in I.C. § 35–9–27.4–3.

The Romines contend that the trial court erred in not supporting its ruling by an explicit finding that the water flowed in a "channel" as provided in I.C. § 35–9–27.4–3. The Romines are correct in their observation that the court did not include the term "channel" in describing the watercourse (viz., "traversing . . . across defendants' real estate . . . is a natural surface watercourse having a well-defined direction"). First, we observe that although the trial court was permitted to utilize the definition in section 3, it was not obligated to do so. Moreover, we see no indication that "channel" is intended to be a magic word in this context. Rather, the common-law and statutory definitions both convey the same idea—a natural surface watercourse is one through which water regularly, though not constantly, flows along and through an identifiable and more or less permanent course, which includes among its features a bed where a natural stream of water runs. See Merriam–WebsterDictionary, available at www.m-w.com/cgi-bin/dictionary. It is fair to say in the instant case that the required criteria under either the common-law or statutory definitions of "natural surface water-course" were either explicitly or implicitly set out in the trial court's findings; this includes the existence of a channel.

 We note as an aside that the Romines contend that if the trial court applied the common-enemy doctrine, the outcome should be different. As indicated previously, under the common enemy doctrine, surface water that does not flow in defined channels is classified as a common enemy and each landowner may deal with it in such manner that is most fitting under the circumstances. *Argyelan v. Haviland*, 435 N.E.2d 973. The doctrine does not apply, however, to protect the landowner who alters or interferes with a natural watercourse unless the impact on the natural watercourse is minimal. *Bulldog Battery Corp. v. Pica Inv., Inc.*, 736 N.E.2d 333 (Ind.Ct.App.2000). In this case, the trial court determined that the Romines' landscaping endeavors interfered with a natural watercourse. Thus, the common enemy doctrine would not protect them.

2.

Even assuming that all of the aforementioned procedural questions were resolved in favor of the Gagles, the Romines contend that the trial court erred in concluding that the conditions of the statute were met and the Romines were liable for obstructing the flow of water in the watershed area. Basically, the Romines contend that the court erred in finding that the watershed area constituted a natural watercourse. We need not repeat the definition of "natural watercourse" in this context, as it has been thoroughly discussed above. Rather, we will examine the evidence favorable to the judgment and determine whether the findings are clearly erroneous, which in this case means they are not supported by substantial evidence

of probative value. *Garling v. Indiana Dep't of Natural Res.*, 766 N.E.2d 409.

Four experts testified in this case, two on behalf of the Gagles. Richard Durham is a hydraulic engineer employed by the Hamilton County Surveyor's Office. He examined the property in question and stated that groundwater traveled via a "swell" that ran through the watershed area. *The Transcript* at 12. In this context, Durham must have meant a "rounded elevation." *Merriam–WebsterDictionary, available at www.m-w.com/cgi-bin/dictionary*. We must assume Durham was referring to the banks of the course through which the groundwater flowed because, of course, water does not flow along the tops of sloping mounds. It is also possible that Durham was actually referring to a "swale," which is a low-lying or depressed stretch of land. *Id.* Either way, the meaning is consistent with Durham's later assertion that there was "a natural draw coming across the Romines' property" to the Jones Drain. *The Transcript* at 28. "Draw" in this context means "a gully shallower than a ravine." *Merriam–WebsterDictionary, available at www.m-w.com/cgi-bin/dictionary*. Finally, he testified that the water flowed through the area in a well-defined direction.

Richard Ward is a professional land surveyor who owns his own land surveying business. Ward had inspected the watershed area. He testified that groundwater runs through the watershed area via a "somewhat of a swell." *The Transcript* at 83. He characterized the portion of the watershed area through which groundwater flowed as a "natural" waterway. *Id.* at 89. In fact, he agreed that it was an "ancient natural swell waterway," *id.* at 91, that ran in a "definite" direction. *Id.* at 83. A synthesis of Ward's and Durham's testimonies permits a reasonable conclusion that groundwater runs through the watershed area along a natural watercourse that is characterized by a shallow channel. Durham and Ward both agreed, along with a third expert called by the Romines, that the berm constructed by the Romines caused a surface-water problem on the Gagles' property.

A review of the evidence supporting the judgment leads us to conclude that the trial court did not commit clear error in concluding that the Gagles succeeded in establishing the elements of their claim for relief under I.C. § 36–9–27.4–14. That is, there is substantial evidence of probative value that the Romines constructed a berm that (1) obstructed (2) a natural surface watercourse, and that (3) removal of the obstruction will promote better drainage of the Gagles' land. Therefore, we affirm that aspect of the judgment.

3.

The Romines contend that the trial court erred in awarding compensatory damages. When reviewing an award of compensatory damages in cases such as this, we apply the following standard of review:

> The computation of damages is strictly a matter within the trial court's discretion. No degree of mathematical certainty is required in awarding damages as long as the amount awarded is supported by evidence in the record; however, an award may not be based upon mere conjecture, speculation, or guesswork. In property damage actions, the appropriate measure of damages is the difference between the fair market value of the property prior to and after the injury where the injury is permanent. To support an award of compensatory damages, facts must exist and be shown by the evidence which afford a legal basis for measuring the plaintiff's loss. To that end the damages must be refer-

enced to some fairly definitive standard, such as market value, established experience, or direct inference from known circumstances.

*Gasway v. Lalen,* 526 N.E.2d at 1203 (citations omitted). In the instant case, the trial court awarded $10,000.00 to the Gagles, an amount representing the court's assessment of the diminution in the value of their real estate. The Gagles concede that diminution in value is not the correct measure of damages in this circumstance. Rather, they assert that compensatory damages should be measured by the amount necessary to remedy the drainage problem created by the obstruction.

■ It is clear that in cases where an obstruction has caused flooding, which in turn caused property damage, the resulting diminution of value is an appropriate measure of damages. *See id.* There was no evidence in the instant case, however, that the Gagles' property damage was permanent in nature. Rather, it lasted only as long as the current episode of flooding. We agree with the Gagles that the temporary diminution in the value of their property cannot serve as the basis of an award of compensatory damages. Thus, we cannot discern a valid evidentiary basis for the $10,000 compensatory damages award.

Another appropriate measure of damages in lawsuits involving obstructions that cause flooding is the cost of performing remedial measures that would alleviate the flooding. *See Jordan v. Talaga,* 532 N.E.2d 1174 (Ind.Ct.App.1989), *trans. denied.* The Gagles urge us to modify the compensatory award to comport with the recommendations of Durham with respect to undertaking measures that will solve the Gagles' flooding problem. Specifically, the Gagles note that Durham submitted two recommendations. First, he recommended removing the fill dirt placed there by the Romines in 1997. Durham estimat-

ed this would cost approximately $1100. Second, Durham recommended installing twin, twelve-inch perfayer [sic] pipes under a road shared by the Romines' and Gagles' properties, at a cost of $7500. It appears that the Gagles would have us accept both recommendations, and modify the amount of compensatory damages to $8900.

We note first that when the two amounts are added together, the total is $8600, not $8900. Second, our reading of the record convinces us that Durham presented these two remedies as separate and distinct alternatives, not parts of a multi-step strategy, to wit:

A. I think any other thing I had in my report is, I had some recommendations to resolve the problem, that reading this other thing I haven't mentioned. My number one (1) recommendation was to remove the fill material, to open up the swell and to provide a positive drainage, looking into the neighbor's landscaping ... (indiscernible) ... for the balance of the common property line and I provide an estimate back in '97 for that of eleven hundred dollars ($1,100). The second recommendation would be for the installation of a perfayer pipe which would allow them to cross pipe on the adjoining properties. This cross pipe would have to be replaced with twin 12″ pipes that the pipe under ... (indiscernible) ... field to the east of the proposed site and at that time I had estimated probably to cost about seventy-five hundred dollars ($7,500).

Q. Did you ever determine whether any of those others [sic] possibilities were acceptable to the Gagles?

A. I offered them two (2) recommendations and I think we left it at that.

Q. Okay. They didn't say yes or no or were they . . .

A. I think they were inclined to believe that they would like to have the fill material removed. I believe they went with the recommendation number one (12)[sic].

*The Transcript* at 23–24. Therefore, it would not be appropriate to award damages in an amount representing the cost of both alternatives, when only one is required.

■ This leads to the conclusion that compensatory damages should be awarded in the amount of either $1100 (the cost of the first remedial method) or $7500 (the cost of the second remedial method). Obviously, we have no way of discerning which of the two the trial court would choose, because its original award was based on different criteria. Moreover, we are in a poor position to evaluate the merits of one alternative over the other. We therefore must remand this case to the trial court to reconsider the award of compensatory damages and to fashion a new award consistent with the principles set out above.

### 4.

The Romines contend that the trial court erred in awarding punitive damages. We note that the Romines' argument focuses upon the question of whether punitive damages were appropriate at all, and not on the amount of the award. We therefore will confine our discussion to the question of whether punitive damages were appropriate.

■ When reviewing an award of punitive damages, we consider only the probative evidence and the reasonable inferences supporting the judgment. *Stroud v. Lints*, 760 N.E.2d 1176 (Ind.Ct.App. 2002). In so doing, we do not weigh evidence or assess witness credibility. *Id.* We determine whether "a reasonable trier of fact could find by clear and convincing evidence that the defendant acted with malice, fraud, gross negligence or oppressiveness that was not the result of a mistake of fact or law, honest error of judgment, overzealousness, mere negligence, or other human failing." *Id.* at 1179. "Clear and convincing evidence" in this context "may be defined as an intermediate standard of proof greater than a preponderance of the evidence and less than proof beyond a reasonable doubt and requires the existence of a fact be highly probable." *Erie Ins. Co. v. Hickman by Smith*, 605 N.E.2d 161, 162 (Ind.1992). A punitive damages award that is a product of fair procedures is cloaked with a strong presumption of validity. *Id.*

The Romines contend that they were not motivated by the requisite intent when they constructed the berm that created the flooding problem on the Gagles' property. Rather, they contend that a reasonable interpretation of then existing law, especially with respect to the common enemy doctrine, led them to believe that they had a legal right to do what they did.

The undisputed evidence favorable to the award of punitive damages reveals that the relationship between the Romines and the Gagles, as adjoining property owners, was far from harmonious. By the summer of 1997, the Romines had lost a court battle to the Gagles concerning the drainage of groundwater that was common to their properties. At that time, without consulting the Gagles or even informing them of their intentions, the Romines began constructing what amounted to a dam. It seems clear from the record that the Romines knew or reasonably should have know that the dam would cause a standing water problem for the Gagles. Indeed it did. The first heavy rainfall after the

berm was installed produced flooding that lasted for weeks. Among other things, the standing water represented a health threat because it affected or threatened to affect the Gagles' septic system. After the Gagles filed suit, the parties negotiated until an agreement was reached. The Gagles agreed to cancel the trial setting in exchange for the Romines' agreement to remove the dirt. However, within approximately one year of that "settlement," the Romines had not only failed to remove the dirt, but had added to the berm by trucking in even more dirt. Moreover, Thomas Romine admitted at trial that the standing water problem that resulting from the berm was unrelated to the pond that had been the subject of the previous lawsuit filed by the Gagles.

■■■ After reviewing this evidence, we conclude that a reasonable trier of fact could find by clear and convincing evidence that when the Romines built the dam and then added to it, they were motivated to do so because of the strained relationship with the Gagles. Therefore, the trial court did not err in holding that the Romines acted with malice and that the actions were not the result of a mistake of fact or law, honest error of judgment, overzealousness, mere negligence, or other human failing. *See Stroud v. Lints,* 760 N.E.2d 1176. The trial court did not err in awarding punitive damages.

### 5.

Lastly, the Romines contend that the trial court erred in awarding a prescriptive easement in favor of the Gagles.

■■■■■ As is the case with adverse possession, a party claiming a prescriptive easement must establish that the use was adverse, actual, exclusive open, notorious, continuous, uninterrupted and under a claim of right. *Ballard v. Harman,* 737 N.E.2d 411 (Ind.Ct.App.2000). Also, the

claimant must demonstrate that the adverse possession of the land occurred over a twenty-year period. Ind.Code Ann. § 32–23–1–1 (West 2002). The existence or non-existence of a prescriptive easement is a question of fact. *Ballard v. Harman,* 737 N.E.2d 411. The continuous use of the easement by predecessors in title may be added to the use of the present claimant in order to satisfy the twenty-year requirement. *Id.* The party asserting a prescriptive easement bears the burden of establishing each element of the claim. *Id.*

In challenging the court's ruling that a prescriptive easement exists in favor of the Gagles, the Romines contend that there is nothing in the record reflecting "actual, hostile, open, notorious, continuous, uninterrupted and adverse use by Gagles of Romine's [sic] real estate with knowledge and acquiescence of Romines." *Brief of Appellant* at 27. In support of this argument, the Romines offer only the following bare assertion: "Mr. Gagle testified he had moved to the site 13 years ago." *Id.*

■■■ At best, the Romines' argument can be understood to challenge only the requirement that the Gagles establish the requisite twenty-year period. The Romines' argument on this point is almost nonexistent and thus risks waiver. *See* Ind. Appellate Rule 46A(8)(a); *Diaz v. State,* 753 N.E.2d 724, 730 (Ind.Ct.App. 2001). We note, however, that the Gagles presented evidence that their property was owned before them by Bol. Bol had owned the property since 1979. Therefore, because that period of ownership could be tacked onto the Gagles', the Gagles presented sufficient evidence to establish the twenty-year period.

■■■ The remainder of the Romines' claims on this issue is that there was no evidence that the Gagles' use was

actual, hostile, open, notorious, continuous, uninterrupted and adverse. The Romines offer absolutely no facts, authority, or argument to support their claims in this regard. A party generally waives any issue for which it fails to develop a cogent argument or support with adequate citation to authority and portions of the record. App. R 46A(8)(a); *Diaz v. State*, 753 N.E.2d 724. Therefore, we will not address these claims.

Judgment affirmed in part, reversed in part, and remanded.

NAJAM, J., and SHARPNACK, J., concur.