A.J., Appellant,

v.

LOGANSPORT STATE HOSPITAL,
Appellee.

No. 66A05–1012–MH–805.

Court of Appeals of Indiana.

Sept. 19, 2011.

Craig A. Dechert, Kokomo, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Frances Barrow, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

After A.J. was charged with two counts of class A felony child molestation, he was found incompetent to stand trial and was committed to Logansport State Hospital ("Logansport") for competency restoration services. After six months, A.J. had not attained competency, and Logansport initiated regular commitment proceedings as required by statute. Following a hearing, the trial court found A.J. mentally ill and dangerous and granted the commitment petition.

A.J. appeals, presenting several arguments: (1) that Logansport failed to comply with the statutory rule requiring that the commitment proceedings contain a report from a community mental health center; (2) that the trial court erred in ad-

mitting State's Exhibit 1, a psychological testing report completed by a Logansport employee for the purpose of assessing A.J.'s risk of sexual recidivism; (3) that there was insufficient evidence that he was dangerous; and (4) that he was denied due process because the trial court took into account that competency restoration services are offered only in state institutions and because he cannot be restored to competency. We conclude as follows: (1) that Logansport may be considered a community mental health center for the purpose of satisfying the statutory report requirement; (2) that State's Exhibit 1 was admissible as it constituted both a statement made for purposes of medical diagnosis and a report made in the course of a regularly conducted business activity; (3) that there was sufficient evidence that A.J. is dangerous; and (4) that the trial court's consideration of competency restoration services and the probability that he will attain competency did not violate his due process rights. Accordingly, we affirm.

### Facts and Procedural History

The pertinent facts stem from three different causes involving A.J.: the instant civil commitment case, cause number 66C01–0910–MH–16 ("MH–16"), the criminal case giving rise to this civil commitment case, cause number 66C01–0808–FA–2 ("FA–2"); and a previous criminal case, cause number unknown. The facts provided herein are taken solely from the record of this civil commitment case, which is the only record before us.

A.J. was born prematurely at twenty-two weeks' gestation in December 1986. He suffered a stroke in utero causing deafness, partial blindness, a seizure disorder, and porencephaly (an area involving a cyst or cavity), which continues to enlarge, in the left side of his brain. His IQ is 65, which is in the mild mental retardation range. He also has hypothyroidism. He attended the Indiana School for the Deaf in Indianapolis from preschool until age twenty, and uses sign language to communicate.

In 2007, while still at the School for the Deaf, A.J. was involved in an incident that gave rise to his first criminal conviction. The facts are sparse and uncertain. The State presents the facts as testified to by A.J.'s mother ("Mother"). She testified that A.J. and another boy carried a girl down some stairs. The other boy got on top of the girl. When the girl cried and screamed, A.J. left to find a teacher and brought the teacher back to help the girl. A.J. was charged with sexual battery and pled guilty to criminal confinement.[1]

In August 2008, A.J. was on probation for his criminal confinement conviction and living with his mother in Pulaski County, when the State filed FA–2, the criminal case leading to the civil commitment in issue here. In FA–2, the State charged A.J. with two counts of class A felony child molestation. Specifically, the State alleged that between December 2007 and July 2008, A.J. molested his niece and nephew, ages three and five. Again, the facts are sparse. According to the June 3, 2010, psychological testing report ("State's Exhibit 1") prepared by Judy Gilbert, a master's-level behavioral clinician at Logansport, A.J. "reported" that he touched

---

1. The psychological testing report prepared by Judy Gilbert, a master's level behavioral clinician at Logansport, describes the incident as follows: A.J. and a friend encountered a female student, who was about eighteen years of age; A.J. held the victim's legs while the other boy touched her breast; A.J. was charged with confinement and rape; and he went to jail for five days, but the charges were dismissed. State's Ex. 1. The report does not indicate the source of this information.

his nephew's penis once and that he had vaginal intercourse with his niece twice as she sat on his lap. State's Ex. 1. Gilbert states, "It is unclear how the matter was investigated and how this resulted in his charges." *Id.*

After his arrest in FA–2, from October 2008 through April 2009, A.J. was on in-home detention. During that time, "he was compliant in all aspects of the program. . . . There was [sic] no issues of him being out of range. He was always in the presence of either his mother or his stepfather the entire time." Tr. at 16.

At some point in FA–2, the trial court determined that there were reasonable grounds for believing that A.J. was not competent to stand trial and ordered that he be evaluated by two psychiatrists, Dr. Ned P. Masbaum and Dr. Steven H. Berger. On January 12, 2009, Dr. Masbaum submitted his report opining that "it is unlikely that [A.J.] can ever be restored to competence to stand trial." Respondent's Ex. at 9.[2] On January 24, 2009, Dr. Berger submitted his report, in which he stated, "[A.J.] will never be restored or habilitated to competence to stand trial. He ha[s] the mind of a 5 year old. He never has had and never will have the cognitive ability to achieve competence to stand trial." *Id.* at 22.

The trial court held a hearing on A.J.'s competency, found that A.J. was not competent to stand trial, and ordered him committed to the Division of Mental Health and Addiction ("DMHA") of the Indiana Family and Social Services Administration ("FSSA") to receive competency restoration services. Competency restora-

tion services in Indiana are offered only in DMHA-operated state hospitals, of which there are six. A.J. was ordered to receive those services at Logansport State Hospital and was admitted there on April 30, 2009.

In July 2009, Dr. Douglas R. Morris, a staff psychiatrist at Logansport, evaluated A.J.'s competency to stand trial.[3] At that time, Dr. John R. Thompson was A.J.'s treating psychiatrist. At no time relevant to this appeal has Dr. Morris been A.J.'s treating psychiatrist. In September 2009, Dr. Morris again evaluated A.J.'s competency. In the September 2009 competency evaluation, Dr. Morris concluded that "[A.J.] is not currently capable of understanding the nature and objectives of the legal proceedings against him," and "is not currently capable of assisting counsel in his defense." Respondent's Ex. B. at 5. Dr. Morris recommended that A.J. remain at Logansport "for further treatment and evaluation, continued competency restoration efforts, an[d] initiation of Regular Commitment proceedings." *Id.* at 6.

On October 7, 2009, Logansport, through its designee Dr. Thompson, filed a petition for the involuntary commitment of A.J., thereby initiating MH–16. The petition alleged that A.J. was suffering from a psychiatric disorder and a developmental disability. The petition averred that A.J. was "gravely disabled" and "not able to provide for his essential human needs secondary to his mental illness and his developmental disability." Appellant's App. at 12. The petition indicated that there were no "recent harmful acts or significant threats of harmful acts." *Id.* at 11.

---

**2.** In fact, Dr. Masbaum posited, "[I]t is also my opinion based on reasonable medical certainty that [A.J.] was not competent to enter into the Plea Agreement [to plead guilty to criminal confinement] at the time he did so in Marion County. His mental defect was the

same then as now and actually predates his birth." Respondent's Ex. B at 9.

**3.** This evaluation in not in the record before us.

Along with the petition, Dr. Thompson filed a "Physician's Statement." *Id.* at 13. Dr. Thompson indicated that A.J. was suffering from a psychiatric disorder, "Pedophilia," and a developmental disability, "Mild Mental Retardation." *Id.* Dr. Thompson stated that A.J. was gravely disabled, rather than dangerous, as a result of these conditions. Dr. Thompson stated that in his opinion, A.J. was in need of "custody, care, or treatment in an appropriate facility," that voluntary treatment was not appropriate because A.J.'s "developmental disabilities and lack of insight prevent his being able to invest himself in voluntary treatment," that Logansport was "suitable for the necessary care, treatment and protection" of A.J. and others, and that Logansport was "the least restrictive environment." *Id.* at 14–15.

On September 29, 2010, the trial court held a hearing on the commitment petition. At the time of the hearing, A.J. had been at Logansport seventeen months. Dr. Morris testified as an expert witness for Logansport. A.J. stipulated to Dr. Morris's credentials as an expert. Logansport submitted State's Exhibit 1, the psychological testing report completed by Judy Gilbert, through Dr. Morris. A.J. objected on grounds that it was not his complete medical record, that it did not have a certificate of authentication, and that Gilbert was not present at the hearing. Tr. at 30–31. The trial court admitted State's Exhibit 1 over A.J.'s objection. In State's Exhibit 1, Gilbert concluded that A.J.'s sexual risk assessment indicated that he was at a high risk to sexually reoffend.

On December 3, 2010, the trial court entered its amended order[4] granting Logansport's petition for involuntary commit-

ment, which reads in relevant part as follows:

7. [A.J.] was convicted of criminal confinement in Marion County, Indiana, for an act that occurred while he was at the Indiana School for the Deaf, and was subsequently placed on probation.

. . . .

9. [A.J.] was charged with child molesting while residing with [Mother] and on probation.

. . . .

12. [Mother] obtained a guardianship over the person and estate of [A.J.] subsequent to his placement at Logansport State Hospital.

13. [Mother], with the assistance of several other adults, has developed a plan to assist [A.J.] with his personal care, in what might be characterized as assisted living.

14. [Mother], with the assistance of several other adults, has developed a safety plan to insure that [A.J.] commits no criminal acts while under her care.

15. The Cass/Pulaski Community Corrections Program has approved that plan [and] is prepared to accept A.J. as a client if he were to be returned to its program.

. . . .

18. Judy Gilbert performed a risk assessment which resulted in a determination that [A.J.] is a high risk to sexually reoffend.

19. [A.J.], after a period of time at Logansport State Hospital, broke hospital rules and engaged in inappropriate sexual contact with other patients.

. . . .

21. The Indiana Division of Mental Health and Addiction has no provision

---

4. The initial order was entered November 26, 2010, but it was amended due to an error in the caption.

for or offers any services [sic] in relation [to] restoration of competency to stand trial outside of an institutional setting, and those services are unavailable on an outpatient basis for a ward under a guardianship.

22. [A.J.] has provided the Court with no alternatives for an outpatient therapy program.

23. [A.J.] is mentally ill.

24. [A.J.] is dangerous.

25. [A.J.] is not gravely disabled.

26. The petition of Logansport State Hospital for the involuntary commitment of [A.J.] should be granted, not because Logansport State Hospital is the only place, and not because anyone has even suggested it is the most appropriate place, for a mentally retarded individual, or a criminal defendant awaiting trial with a diagnosis of pedophilia, but because services to restore one to competency to stand trial must be boot strapped on a diagnosis of mental illness or dangerous as Indiana provides those services in no place other than a mental institution. No constitutional impediments have been alleged or argued.

Appellant's App. at 20. The trial court ordered A.J. committed to Logansport for a program of rehabilitative services to address pedophilia and restoration services to establish competency to stand trial and for Logansport to submit a report on A.J. within ninety days of the court order.

A.J. appeals. Additional facts will be provided as necessary.

## Discussion and Decision

### *Standard of Review*

▮ Our standard of review for an order of civil commitment is well settled.

[W]e consider only the evidence favorable to the judgment and all reasonable inferences therefrom. We will not reweigh the evidence or judge the witnesses' credibility. Where the evidence is in conflict, we are bound to view only that evidence that is most favorable to the trial court's judgment. If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, the order must be affirmed, even if other reasonable conclusions are possible.

*In re Commitment of Bradbury*, 845 N.E.2d 1063, 1065 (Ind.Ct.App.2006) (citations and quotation marks omitted).

▮ In this case, part of our task is to decipher the interplay among several statutes. Competency of criminal defendants to stand trial is governed by Indiana Code Chapter 35–36–3; regular commitment of mentally ill individuals is governed by Indiana Code Chapter 12–26–7,[5] and the definitions used in these statutes are found in Indiana Code Chapter 12–7–2.

A question of statutory interpretation is a matter of law. In such interpretation, the express language of the statute and the rules of statutory interpretation apply. We will examine the statute as a whole, and avoid excessive reliance on a strict literal meaning or the selective reading of words. Where the language of the statute is clear and unambiguous, there is nothing to construe. However, where the language is susceptible to more than one reasonable interpretation, the statute must be construed to give effect to the legislature's intent. The legislature is presumed to have intended the language used in the statute to be

---

5. A "regular" commitment is an involuntary commitment that is reasonably expected to require custody, care, or treatment for more than ninety days. Ind.Code § 12–26–7–1. An involuntary commitment for a period of less than ninety days is a "temporary" commitment and is governed by Indiana Code Chapter 12–26–6.

applied logically and not to bring about an absurd or unjust result. Thus, we must keep in mind the objective and purpose of the law as well as the effect and repercussions of such a construction.

*In re J.J.*, 912 N.E.2d 909, 910 (Ind.Ct. App.2009) (quoting *Nash v. State*, 881 N.E.2d 1060, 1063 (Ind.Ct.App.2008), *trans. denied*). In addition, where "statutes address the same subject, they are in pari materia, and we harmonize them if possible." *Saintignon v. State*, 749 N.E.2d 1134, 1137 (Ind.2001) (citation and quotation marks omitted).

### Overview of Competency Proceedings

If a trial court has "reasonable grounds to believe that a [criminal] defendant lacks the ability to understand the proceedings and assist in the preparation of a defense," the trial court must appoint two or three competent, disinterested psychiatrists, psychologists, or physicians to examine the defendant and testify at a hearing as to whether the defendant is competent to stand trial. Ind.Code § 35–36–3–1(a). If, following a hearing, the trial court finds that the defendant does *not* have the ability to understand the proceedings and assist in the preparation of the defendant's defense, the court "shall delay or continue the trial and order the defendant committed to the [DMHA]," and the DMHA shall provide competency restoration services or contract with a third party to provide those services. Ind.Code § 35–36–3–1(b). Here, on April 30, 2009, A.J. was admitted to Logansport for competency restoration

services pursuant to Indiana Code Section 35–36–3–1.

Within ninety days after a defendant's admission to a state institution, such as Logansport,[6] the superintendent of the state institution "shall certify to the proper court whether the defendant has a substantial probability of attaining the ability to understand the proceedings and assist in the preparation of the defendant's defense *within the foreseeable future.*" Ind. Code § 35–36–3–3(a) (emphasis added). If a substantial probability of attaining competency within the foreseeable future does *not* exist, the state institution "shall initiate regular commitment proceedings under IC 12–26." Ind.Code § 35–36–3–3(b). If a substantial probability *does* exist, the state institution shall retain the defendant until *either* the defendant attains competency *or* for six months from the date the defendant was admitted to a state institution, whichever occurs first.[7] *Id.* If a defendant has not attained competency *within six months* of defendant's admission to a state institution, the state institution "shall institute regular commitment proceedings under IC 12–26." Ind.Code § 35–36–3–4. Here, Logansport filed its petition for regular commitment of A.J. as required by Indiana Code Section 35–36–3–4.

### Overview of Regular Commitment Proceedings

Like other civil proceedings, commitment proceedings are conducted according to the Indiana Rules of Trial Procedure. Ind.Code § 12–26–1–6. The petitioner seeking involuntary commitment, here Lo-

---

**6.** "State institution" is defined to specifically include Logansport State Hospital. Ind.Code § 12–7–2–184.

**7.** Although the ninety-day certification is not in the record before us, we presume that because regular commitment proceedings were not initiated under Indiana Code Sec-

tion 35–36–3–3, Logansport's superintendent certified to the trial court that A.J. had a substantial probability of attaining the ability to understand the proceedings and assist in the preparation of his defense within the foreseeable future.

gansport, "is required to prove by clear and convincing evidence that: (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." Ind.Code § 12–26–2–5. "Mental illness," for purposes of Indiana Code Article 12–26, means "a psychiatric disorder that: (A) substantially disturbs an individual's thinking, feeling, or behavior; and (B) impairs the individual's ability to function. The term includes mental retardation, alcoholism, and addiction to narcotics or dangerous drugs." Ind.Code § 12–7–2–130. "Dangerous," for purposes of Indiana Code Article 12–26, means "a condition in which an individual as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." Ind.Code § 12–7–2–53.

If after the hearing, the trial court finds that the individual is mentally ill and either dangerous or gravely disabled, the court may either enter an order for "the individual's custody, care, or treatment, or continued custody, care, or treatment in an appropriate facility" or enter an order for "the individual to enter an outpatient therapy program under IC 12–26–14." Ind. Code § 12–26–7–5. Such an order continues until the individual has been discharged from the facility or the court enters an order terminating the commitment. *Id.*

At least annually, and more often if the court so directs, the superintendent of the facility or the attending physician must file with the court a review of the individual's care and treatment, which must include statements concerning the mental condition of the individual, whether the individual is dangerous or gravely disabled, and whether the individual needs to remain in the facility or may be cared for under a guardianship. Ind.Code § 12–26–15–1.

We now address the issues raised by A.J.

### I. Is Logansport a Community Mental Health Center?[8]

■ A.J. argues that Logansport failed to follow the requirements of Indiana Code Section 12–26–7–3, which provides in relevant part as follows:

(a) A petition filed under section 2 of this chapter must include a physician's written statement that states both of the following:

(1) The physician has examined the individual within the past thirty (30) days.

(2) The physician believes that the individual is:

(A) mentally ill and either dangerous or gravely disabled; and

(B) in need of custody, care, or treatment in a facility for a period expected to be more than ninety (90) days.

(b) Except as provided in subsection (d), if the commitment is to a state institution administered by the division of mental health and addiction, *the record of the proceedings must include a report from a community mental health center* stating both of the following:

(1) The community mental health center has evaluated the individual.

(2) Commitment to a state institution administered by the [DMHA] under this chapter is appropriate.

(c) The physician who makes the statement required by subsection (a)

---

8. A.J. framed this issue, as well as the issue addressed in the following section regarding the admissibility of State's Exhibit 1, in terms of sufficiency of the evidence. We think that these issues are more appropriately addressed as independent questions and address them as such.

may be affiliated with the community mental health center that makes the report required by subsection (b).

(d) If the commitment is of an adult to a research bed at Larue D. Carter Memorial Hospital, as set forth in IC 12–21–2–3, the report from a community mental health center is not required.

(Emphasis added.)

Specifically, A.J. contends that the record of his commitment proceedings does not include a report from a community mental health center ("CMHC") stating that the CMHC has evaluated the individual and commitment to a state institution is appropriate as required by Section 12–26–7–3(b). He argues that Logansport is a state institution and not a CMHC.

"State institution" is defined by Indiana Code Section 12–7–2–184, which provides,

(a) "State institution" means an institution:

(1) owned or operated by the state;

(2) *for the observation, care, treatment, or detention of an individual;* and

(3) under the administrative control of a division.

(b) The term includes the following:

(1) Evansville State Hospital.

(2) Evansville State Psychiatric Treatment Center for Children.

(3) Fort Wayne State Developmental Center.

(4) Larue D. Carter Memorial Hospital.

(5) *Logansport State Hospital.*

(6) Madison State Hospital.

(7) Richmond State Hospital.

(Emphases added.)

A "CMHC" is defined by Indiana Code Section 12–7–2–38 as follows:

"Community mental health center" means a program of services that meets the following conditions:

(1) Is approved by the division of mental health and addiction.

(2) Is organized *for the purpose of providing multiple services for persons with mental illness or a chronic addictive disorder.*

(3) Is operated by one (1) of the following or any combination of the following:

(A) A city, a town, a county, or another political subdivision of Indiana.

(B) *An agency of the state.*

(C) An agency of the United States.

(D) A political subdivision of another state.

(E) *A hospital owned or operated by a unit of government described in clauses (A) through (D).*

(F) A building authority organized for the purpose of constructing facilities to be leased to units of government.

(G) A corporation incorporated under IC 23–7–1.1 (before its repeal August 1, 1991) or IC 23–17.

(H) A nonprofit corporation incorporated in another state.

(I) A university or college.

(Emphases added).[9]

Some additional explanation regarding the role of a CMHC is helpful to the resolution of the issue. In general, "[i]ndividuals are admitted to a state hospital

---

**9.** Also, 440 Indiana Administrative Code 9–1–4 provides that "CMHC" means "a mental health facility that the [DMHA] has certified as fulfilling the statutory and regulatory requirements to be a community mental health center."

only after a screening by a [CMHC] responsible for providing case management to the individual in both the hospital and the community." STATE OF INDIANA WEBSITE, http://www.in.gov/fssa/dmha/4325.htm (last visited Aug. 1, 2011). "Involuntary commitment may be sought through the CMHC by a friend, relative, or law enforcement representative." *Id.;* Ind.Code § 12–26–7–2(b). We infer that the purpose of the report requirement of Section 12–26–7–3(b) is to insure that when a friend, relative, or law enforcement representative seeks involuntary commitment of an individual, qualified persons have evaluated the individual and determined that commitment to a state institution is appropriate.

In the case at bar, regular commitment proceedings were not initiated by a friend, relative, or law enforcement representative but by Logansport, a state institution, that filed the petition for A.J.'s regular commitment as required by Indiana Code Section 35–36–3–4. In addition, when the petition for regular commitment was filed, A.J. had already been committed to Logansport pursuant to Section 35–36–3–1(b) because he had been found incompetent to stand trial. We believe that in A.J.'s circumstances, a state institution may be considered a CMHC for the purpose of providing the report required by Section 12–26–7–3(b).

█ Logansport is a state institution operated for the "observation, care, treatment, or detention of an individual." Ind. Code § 12–7–2–184. Similarly, a CMHC is "organized for the purpose of providing multiple services for persons with mental illness or a chronic addictive disorder." Ind.Code § 12–7–2–38. The requirement that a CMHC "provid[e] multiple service for persons with mental illness" falls within the state institution's broader purpose "for the observation, care, treatment, or

detention of an individual." Considering the respective purposes of a state institution and a CMHC, a state institution can reasonably be considered a CMHC. Also, a state institution must be owned or operated by the state, and by definition, a CMHC includes a hospital operated by a state agency. Logansport is operated by a division of the FSSA, a state agency. Finally, where an individual has already been committed to a state institution due to incompetency to stand trial, a report offered by that state institution ensures that regular commitment is appropriate equally as well as a report offered by a CMHC when a petition for regular commitment is brought by a friend, relative, or law enforcement representative. As such, we conclude that when a defendant has been previously committed to a state institution due to incompetency to stand trial, a state institution may be considered a CMHC for purposes of the report required by Section 12–26–7–3(b). *See B.K.C. v. State,* 781 N.E.2d 1157, 1167 (Ind.Ct.App.2003) ("A fundamental principle of construction is to construe the statute in accordance with the purpose of the statute and the statutory scheme of which it is a part.").

█ Because we have concluded that Logansport may be considered a CMHC under the circumstances present here, Section 12–26–7–3(b) will be satisfied if the record contains a report from Logansport stating that (1) A.J. has been evaluated and (2) his commitment to a state institution administered by the DMHA is appropriate. The record before us includes Dr. Thompson's physician's statement indicating that A.J. was evaluated and concluding that commitment to Logansport is "suitable for the necessary care, treatment, and protection of the patient and others" and that it offers "the least restrictive environment" that will meet A.J.'s needs. Appellant's App. at 15. Thus, commitment to

Logansport is appropriate for A.J. The fact that the physician's statement filed with the petition serves to satisfy both subsections 12–26–7–3(a) and –(b) is of no moment. We observe that the "physician who makes the statement required by subsection (a) may be affiliated with the [CMHC] that makes the report required by subsection (b)." Ind.Code § 12–26–7–3(c). In addition, Dr. Morris testified that Logansport "is the least restrictive environment suitable for [A.J.'s] care and treatment" even if the criminal charges were not a factor. Tr. at 42. Based on the record before us, we conclude that the requirements of Section 12–26–7–3 have been satisfied.[10]

### II. Admission of State's Exhibit 1

 A.J. asserts that the trial court erred in admitting State's Exhibit 1, the psychological testing report prepared by Judy Gilbert, a master's-level behavioral clinician at Logansport, to whom A.J. was referred for sexual risk assessment. On appeal, A.J. states that he "objected to the admission of the exhibit on grounds that it was not the full record of [A.J.'s] from Logansport State Hospital, did not have a certificate of authentication, and the preparer of said document was unavailable for cross examination." Appellant's Br. at 10. He later asserts that Dr. Morris's testimony was based on hearsay, referring to State's Exhibit 1, and that it was "harmful error for the Court to find that [A.J.] had engaged in inappropriate sexual contact based upon hearsay evidence." *Id.* at 11. That is the full extent of his argument that State's Exhibit 1 was inadmissible. Due to the lack of cogent reasoning, A.J. has waived this argument. *See* Ind. Appellate Rule 46(A)(8)(a) ("The argument must con-

tain the contentions of the appellant on the issues presented, supported by cogent reasoning."); *Romine v. Gagle,* 782 N.E.2d 369, 386 (Ind.Ct.App.2003) ("A party generally waives any issue for which it fails to develop a cogent argument or support with adequate citation to authority and portions of the record."), *trans. denied.*

 Waiver notwithstanding, A.J.'s argument is unavailing. "We review decisions concerning the admissibility of evidence for an abuse of discretion." *Walker v. Cuppett,* 808 N.E.2d 85, 92 (Ind.Ct.App. 2004). An abuse of discretion occurs if the trial court's action is clearly erroneous and against the logic and effect of the facts and circumstances before the court. *In re Estate of Holt,* 870 N.E.2d 511, 514–15 (Ind. Ct.App.2007), *trans. denied* (2008).

 A.J. argues that State's Exhibit 1 did not have a certificate of authentication. Pursuant to Indiana Evidence Rule 901, evidence is properly authenticated or identified by "[t]estimony of a witness with knowledge that a matter is what it is claimed to be." Dr. Morris's credentials as an expert witness were stipulated to by A.J., and Dr. Morris testified that he was generally familiar with the charts and records that are kept in the course of business at Logansport. Tr. at 29. Dr. Morris identified State's Exhibit 1 as a psychological testing report preformed at Logansport for the purpose of assessing A.J.'s risk of sexual recidivism. *Id.* Therefore, State's Exhibit 1 was properly authenticated.

A.J. also argues that State's Exhibit 1 is inadmissible hearsay. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or

---

10. Since Indiana Code . Section 12–26–7–3 does not explicitly address the situation presented in this case, i.e., where commitment proceedings are initiated under Article 12–26 by a state institution as required by Chapter 35–36–3, it would be helpful for the General Assembly to review this issue to ensure that its will is effected.

hearing, offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801. "Hearsay is not admissible except as provided by law or by [the rules of evidence]." Ind. Evidence Rule 802.

■ We reject A.J.'s argument that State's Exhibit 1 was inadmissible hearsay. Evidence Rule 803 sets forth categories of evidence that are not excluded by the hearsay rule even though the declarant is available as a witness. Evidence Rule 803(4) provides for the admissibility of "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Evidence Rule 803(6) permits the admission of

> [a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony or affidavit of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. The term "business" as used in this Rule includes business, institution, association, profession, occupa-

tion, and calling of every kind, whether or not conducted for profit.

Dr. Morris identified State's Exhibit 1 as a psychological testing report performed at Logansport. Tr. at 29. He testified that the purpose of the report was to assess the risk of A.J.'s sexual recidivism, which is done routinely in the course of business for patients at Logansport. *Id.* He further testified that the report "is certainly, as with all psychological testing reports performed at Logansport—a part of [A.J.'s] treatment record for his hospitalization at Logansport State Hospital." *Id.* at 35. Therefore, the psychological testing report was both a statement made for the purposes of medical treatment pursuant to Evidence Rule 803(4) and a record of regularly conducted business activity pursuant to Evidence Rule 803(6), and accordingly was not excluded by the hearsay rule. Accordingly, the trial court did not abuse its discretion in admitting State's Exhibit 1.

### III. Sufficiency of the Evidence

■ A.J. contends that there is insufficient evidence to support the trial court's finding that he is dangerous.[11] A.J. does not challenge the trial court's finding that he has a mental illness based on his diagnoses of pedophilia and mild mental retardation. "The determination of dangerousness under the involuntary commitment statute has always been a question of fact for the trial court to decide." *Commitment of S.T. v. Cmty. Hosp. N.*, 930 N.E.2d 684, 689 (Ind.Ct.App.2010).

Here, State's Exhibit 1 indicated that A.J. was at high risk to sexually reoffend.

---

11. Logansport interprets A.J.'s discussion regarding the allegation in the commitment petition that he was gravely disabled rather than dangerous, as an argument that it was improper for Logansport to offer evidence that A.J. was dangerous. *See* Appellant's Br. at 10; Appellee's Br. at 14–15. We do not think that the two sentences in A.J.'s brief regarding the petition's allegation are intended to present such an argument. If so, the issue is waived for failure to present a cogent argument. *See* Ind. Appellate Rule 46(A)(8)(a); *Romine*, 782 N.E.2d at 386.

In addition, Dr. Morris testified that A.J. suffers from pedophilia and mild mental retardation. He explained that the "diagnosis of pedophilia is used when an individual has had sexual attraction [to], or engaged in sexual behaviors toward a prepubescent child ... ongoing over a period of months, and the person diagnosed with pedophilia is at least five (5) years older than the child." Tr. at 27. Dr. Morris testified that A.J. "is dangerous to others" and that there is an "ongoing risk that he will engage in inappropriate sexual behavior potentially with children." *Id.* at 28. He based this assessment on

> both the situation that brought [A.J.] to his—to Logansport State Hospital with his current charges for child molestation, which probable cause was found to charge him with these offenses. It is also based on ongoing difficulties in recent months at Logansport where [A.J.] has engaged in some inappropriate sexual behaviors with peers on his unit of the hospital showing poor judgment as it relates to his ability to control his sexual behavior and engage in appropriate sexual behavior.

*Id.* Dr. Morris further testified that A.J. understands that inappropriate sexual behavior is wrong but that he does it anyway and that A.J. had "admitted his willingness to break hospital rules to engage in sexual activity with others." *Id.* at 28–29. Finally, Dr. Morris testified that A.J. has "impaired judgment specifically related to his ability to engage in appropriate interactions with others, especially ... his tendency to engage in inappropriate sexual behaviors with others in an inappropriate environment." *Id.* at 38.

 Although there is something decidedly Kafkaesque to the fact that the unproven child molestation charges against A.J. serve as a basis for Dr. Morris's and Gilbert's opinions that A.J. is dangerous when A.J. is in a state institution because he cannot stand trial for those charges, that is not the only basis for the trial court's finding that A.J. is dangerous. A.J. suffers from pedophilia, and evidence was presented regarding A.J.'s inappropriate sexual behavior at Logansport, impaired judgment, and willingness to break hospital rules. We cannot reweigh evidence or judge witness credibility. *Bradbury*, 845 N.E.2d at 1065. We must affirm the commitment order if the evidence supports a conclusion that a reasonable person could have drawn even if other reasonable conclusions are possible. *Id.* Accordingly, we conclude that the evidence is sufficient to support the trial court's finding that A.J. is dangerous.[12]

### IV. Due Process

A.J.'s due process argument conflates two questions that we will address separately. First, A.J. asserts that the commitment petition was governed solely by Indiana Code Chapter 12–26–7, and therefore his Fourteenth Amendment due process rights were violated because the trial court also considered Chapter 35–36–3, which requires the DMHA to provide A.J. with competency restoration services, in determining whether to grant the petition. Put another way, are a patient's due process rights violated where an alternative placement otherwise available to a civilly committed patient is foreclosed to a patient against whom criminal charges are pending because competency restoration

---

12. A.J. posits that because Mother instituted a guardianship over him and devised a safety plan, Logansport failed to show that he would present a danger *if* he were placed with family pursuant to the guardianship. Phrased this way, A.J.'s argument adds a qualifier that does not appear in Indiana Code Section 12–26–2–5, and therefore we decline to address it.

services are not offered in the alternative placement? Second, A.J. contends that his due process rights were violated by his commitment to Logansport because he can never be restored to competency.

 The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." It is well established that "[d]ue process precludes placing a defendant on trial while she is incompetent." *State v. Davis,* 898 N.E.2d 281, 284 (Ind. 2008). On the other hand, involuntary commitment to a hospital for the mentally ill is a "massive curtailment of liberty" and must be "accomplished by a state in strict observation of requirements of due process." *Id.* at 288 (citation omitted).

> However, for all its consequence, due process has never been, and perhaps can never be, precisely defined. As the United States Supreme Court has observed, unlike some other legal rules, due process is not a technical conception with a fixed content unrelated to time, place and circumstances. Instead, the phrase expresses the requirement of fundamental fairness, a requirement whose meaning can be as opaque as its importance is lofty. Accordingly, applying the Due Process Clause is thus an uncertain enterprise which must discover what fundamental fairness consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake.

*Id.* at 284 (citations and quotation marks omitted).

With these considerations in mind, we turn to A.J.'s first argument regarding the trial court's decision to commit him not just because it found A.J. mentally ill and dangerous but also because it found that he needed competency restoration services that are provided only in state institutions.[13] In assessing the fundamental fairness of the trial court's decision, one cannot ignore the statutory path that brought A.J. to Logansport. Pursuant to Indiana Code Section 35–36–3–1(b), A.J. was initially committed to Logansport because the trial court found that he was incompetent to stand trial, i.e., that he lacked the ability to understand the proceedings and assist in the preparation of his defense. As a result of the finding of incompetency, the DMHA was required by Section 35–36–3–1(b) to provide A.J. with competency restoration services.

Our supreme court has recently explained,

> The procedures [in Chapter 35–36–3] establish a comprehensive method that balances the various interests at stake. Involuntary commitment is a clear deprivation of the defendant's liberty that can be justified only on the basis of legitimate state interests. The State has dual interests in committing an incompetent defendant: (1) to restore the accused to competency due to the right of the public and the defendant to the prompt disposition of criminal charges pending against him and (2) to protect the defendant against being required to answer to charges that [he] lacks the capacity to understand or assist her attorney in defending against.

---

13. In *Davis,* 898 N.E.2d at 288 n. 6, this issue was raised by amicus ACLU of Indiana, but the court declined to address it because (1) the record contained no information about the status of Davis's commitment other than that she was confined, and therefore evaluation of the impact of pending criminal charges on possible alternative placement options was not possible, and (2) amicus relied on a statute which was based on a determination of incompetency rather than the pendency of criminal charges.

*Curtis v. State*, 948 N.E.2d 1143, 1153–54 (Ind.2011) (citations and quotation marks omitted); *see also Davis*, 898 N.E.2d at 289 ("Justification for the commitment of an incompetent accused is found in the State's interest in the restoration of the accused to competency because of the right of the public and the defendant to the prompt disposition of criminal charges pending against him, and the protection of the accused against being required to answer to charges that [he] lacks the capacity to understand or to assist [his] attorney in defending against.") (citations omitted).

▮▮▮▮ After six months of competency restoration services at Logansport, A.J. still had not attained competency. Therefore, pursuant to Section 35–36–3–4, Logansport was required to petition for regular commitment under Chapter 12–26–7. "In the civil commitment context, justification is predicated on the State's interest in the protection of the public under the police power and the protection of the mentally ill person under the parens patriae doctrine." *Davis*, 898 N.E.2d at 284. In accordance with these interests, the trial court was required to find, and did so find, that A.J. was mentally ill and either dangerous or gravely disabled. However, the trial court did not ignore the fact that the commitment petition was initiated pursuant to Section 35–36–3–4. Thus, the trial court considered all the interests involved: A.J.'s liberty interest, the State's interests in protecting A.J. and the public, and the State's interest in restoring A.J. to competency as well as in protecting A.J. from having to answer to charges that he lacks the capacity to understand. This seems fair to us under the circumstances. We conclude that in determining whether regular commitment to a state institution is appropriate for a patient against whom criminal charges are pending, a trial court's mere *consideration* of the State's interest in restoring a patient's competency to stand trial does not per se violate the patient's due process rights.

▮▮▮ However, to avoid depriving a patient of his due process rights, the State's interest in providing restoration services must be legitimate. *See Curtis*, 948 N.E.2d at 1154 ("Of course the State's interests cannot be realized if there is a finding that a defendant cannot be restored to competency."); *Davis*, 898 N.E.2d at 289 ("Commitment of an accused thus focuses on the State's interest in the accused's restoration to competency and necessarily entails a finding of probability that the accused can be so restored."). This leads us directly to A.J.'s second argument, that his due process rights were violated because he cannot be restored to competency.

To support his contention that his competency cannot be restored, A.J. cites Dr. Berger's opinion that A.J. "never has had and never will have the cognitive ability to achieve competence to stand trial." Respondent's Ex. B. at 22. A.J. likens his case to *Thomas ex rel. Thomas v. Murphy*, 918 N.E.2d 656 (Ind.Ct.App.2009), *trans. denied* (2010). *Thomas* involved the appeals of two individuals, Steven Thomas and Derrick Dausman, both of whom had been initially committed because they were found incompetent to stand trial under Section 35–36–3–1(b). A.J. says that his case is akin to Dausman's, but we disagree. The issue addressed in *Thomas* was ripeness; specifically, whether Dausman's "request for a preliminary injunction preventing the DMHA from placing criminal defendants lacking sufficient comprehension to stand trial in a state institution 'when the medical and psychiatric treatment professionals recommend placement in a less restrictive setting'" was ripe for review. *Id.* at 663 (quoting appellants' appendix). It is true that like A.J., Daus-

man spent six months in Logansport, after which Logansport filed for regular commitment as required by Section 35–36–3–3. However, unlike in A.J.'s case, the trial court in Dausman's case found that Logansport had failed to establish by clear and convincing evidence that Dausman was mentally ill and either dangerous or gravely disabled. Dausman was ordered to be released pursuant to Sections 12–26–7–1 to –5 and to remain out on bond on the underlying criminal charge. Because Dausman had been released from Logansport and was out on bond under the same restrictions as any other criminal defendant, the *Thomas* court concluded that his claim was not ripe for review. *Id.* at 665. In reaching this conclusion, the *Thomas* court opined,

> We believe the State's decision to file the petition for civil commitment of Dausman is an acknowledgement that Dausman has not attained the constitutionally required ability to understand the proceedings and assist in the preparation of his own defense, even after being provided with six months of inpatient competency restoration services.
>
> . . . .
>
> Because the State has effectively acknowledged that Dausman has not attained competency to stand trial within the statutorily-mandated six-month period,[14] we need not determine whether the DMHA must continue providing competency restoration services or provide those services in a different setting. We will not order the DMHA to provide those services to Dausman because

"[t]he law does not require the doing of a useless thing." If Dausman will never be competent to stand trial, competency restoration services will provide no benefit to Dausman and will unnecessarily deplete the limited resources of the DMHA.

*Id.* at 664–65 (quoting *Stropes by Taylor v. Heritage House Childrens Ctr. of Shelbyville, Inc.*, 547 N.E.2d 244, 247 (Ind.1989)).

■ Although the *Thomas* court concluded that Dausman's failure to attain competency within the six-month period set forth in Section 35–36–3–4 meant that competency restoration services were useless, we do not think that this statement amounts to a hard and fast rule that must be applied in every case. Whether competency restoration services will benefit a defendant must be based on the particular circumstances of each case. Here, Dr. Morris testified at the commitment hearing that A.J. was continuing to receive competency restoration services and that "the staff on [A.J.'s] unit are doing an excellent job with his—especially given his underlying intellectual and communication deficits, um, tailoring a program specifically for him with which he has shown progress." Tr. at 38. Dr. Morris opined that there is a "very good possibility" that A.J. can be restored to competency. *Id.* at 38–39. Thus, there is evidence at this time that A.J. can be restored to competency, and therefore the trial court did not violate A.J.'s due process rights by granting the commitment petition based in part on the State's interest in providing him with competency restoration services.[15]

---

**14.** Logansport mischaracterizes the facts of *Thomas* when it states that "experts determined [Dausman] would never be restored to competency," Appellee's Br. at 21, when in fact the *Thomas* court simply inferred that Dausman would never be restored to competency based on the State's initiation of regular

commitment proceedings after six months of competency restoration services.

**15.** We observe that A.J.'s treating physicians had not recommended community placement for A.J.; rather, Dr. Morris opined that institutionalization was appropriate without regard to the criminal charges. Therefore, we

As a final matter, we address the following proposition asserted by Logansport:

The law, however, does not limit restoration services to six months, and specifically holds open the possibility of an indefinite period of time for such services. *"Whenever* the defendant attains the ability to understand the proceedings and assist in the preparation of the defendant's defense ... [Logansport] shall certify that fact to the proper court, which shall enter an order directing the sheriff to return the defendant." Ind.Code § 35–36–3–2 (emphasis added). Consistent with this statute, defendants have received restoration services for as long as four years (*Salyers v. State*, 862 N.E.2d 650, 651 (Ind.2007)), and even five years (*Danks v. State*, 733 N.E.2d 474, 479 (Ind.Ct.App.2000)[, *trans. denied* ] ).

Appellee's Br. at 20. We observe that in neither *Salyers* nor *Danks* were the courts asked to address a due process issue stemming from the defendant's commitment to a state institution. In an ordinary civil commitment, a patient who is no longer dangerous or gravely disabled is eligible for release from custody. Ind.Code § 12–26–7–5(b). Although Chapter 35–36–3 does not provide a definite time period after which competency restoration services are considered futile and therefore unnecessary, an *indefinite* time period is *not* equivalent to an *unlimited* time period. The legislature has suggested a limitation to the time period for restoration services in Section 35–36–3–3, which requires the superintendent of the state institution

holding a defendant to "certify to the proper court whether the defendant has a substantial probability of attaining the ability to understand the proceedings and assist in the preparation of the defendant's defense *within the foreseeable future.*" (Emphasis added.) Foreseeable means "being such as may be reasonably anticipated" or "lying within the range for which forecasts are possible." MERRIAM-WEBSTER DICTIONARY, http://www.merriam-webster.com/dictionary/foreseeable (last visited Aug. 2, 2011).

In *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), the United States Supreme Court stated that "even if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal." The Supreme Court concluded that Jackson had been "confined for three and one-half years on a record that sufficiently establishes the lack of a substantial probability that he will ever be able to participate fully in a trial." *Id.* at 738–39, 92 S.Ct. 1845. Although *Jackson* involved a previous version of Indiana's statutes for pre-trial commitment of a criminal defendant, we think that the reasoning is relevant here because in A.J.'s case, the trial court rejected placement of A.J. under Mother's guardianship because A.J. could receive competency restoration services only in a state institution. Therefore, the State's interest in providing competency services must continue to be demonstrated by reasonable progress toward A.J.'s attainment of competency.[16] *Cf. Harris v. State*, 262 Ind. 208, 214, 314 N.E.2d 45, 49

need not determine whether or to what extent a treatment plan that recommends community placement would affect a defendant's due process rights.

**16.** An issue different from but related to that presented here is whether a trial court's refusal to dismiss charges against an accused that has been found incompetent to stand trial results in a deprivation of due process rights. For the most recent discussions of this issue, see *Denzel v. State*, 948 N.E.2d 808 (Ind. 2011), and *Curtis*, 948 N.E.2d 1143.

(1974) (rejecting appellant's argument that four years of institutionalization for restoration services is presumptively more than a reasonable period of time and concluding that "it is a reasonable inference that within a reasonable period of time it was determined that there was a substantial probability that Appellant would attain competency in the foreseeable future since in fact, Appellant became competent in four (4) years.").

In conclusion, A.J. may not be held perpetually at Logansport solely for competency rehabilitation services if he is not expected to attain competency in the foreseeable future. The trial court is required to review A.J.'s care and treatment on an annual basis, or more often if it so orders. *See* Ind.Code § 12–26–15–1. Each year, Logansport's superintendent or A.J.'s attending physician must file a report with the trial court, which must convey A.J.'s mental condition, whether he is dangerous or gravely disabled, and whether he needs to remain institutionalized or may be cared for under a guardianship. *See id.* When the trial court reviews the appropriateness of A.J.'s placement, it must consider the care and treatment A.J. needs for his mental illnesses, as well as the need to protect A.J. and the public. *See Davis,* 898 N.E.2d at 284. In addition, as there may be alternative options for A.J. that do not offer competency restoration services but are otherwise appropriate for A.J., it will be incumbent upon the court to assess A.J.'s progress toward attaining competency and to determine whether there is a substantial probability that A.J. will attain competency in the foreseeable future. *See Jackson,* 406 U.S. at 738–39, 92 S.Ct. 1845.

Affirmed.

MATHIAS, J., concurs with separate opinion.

BAILEY, J., concurs.

MATHIAS, Judge, concurring.

I concur fully in the resolution of the issues presented in this appeal. I write separately to express the same concerns I raised in my concurring opinion in *Habibzadah v. State,* 904 N.E.2d 367, 369 (Ind. Ct.App.2009), *trans. denied,* and additional concerns raised by A.J.'s circumstances regarding the adequacy of our current criminal justice procedures to resolve the issues presented by defendants suffering from chronic mental illness.

Here, like in *Habibzadah,* all of the psychiatrists who have examined A.J. during the course of the proceedings culminating in the involuntary commitment at issue here, a period spanning approximately two years, have consistently agreed that he has not been and is not currently competent to assist in his defense. The private psychiatrists appointed to conduct A.J.'s initial competency evaluation in 2009 opined that A.J. would *never* be restored to competency. Specifically, Dr. Masbaum, a forensic psychiatrist certified by the American Board of Psychiatry and Neurology, concluded that *"it is unlikely that [A.J.] can ever be restored to competence to stand trial."* Respondent's Ex. at 9 (emphasis added). Similarly, Dr. Berger, another board-certified forensic psychiatrist, concluded that *"[A.J.] will never be restored or habilitated to competence to stand trial. He ha[s] the mind of a 5 year old. He never has had and never will have the cognitive ability to achieve competence to stand trial." Id.* at 22 (emphasis added). Despite these conclusions reached by Dr. Masbaum and Dr. Berger, A.J. was found only to be incompetent to stand trial and ordered committed to Logansport State Hospital ("Logansport") to receive competency restoration services pursuant to Indiana Code section 35–36–3–1.

Five months into this commitment to Logansport, Dr. Morris, a forensic psychiatrist employed by Logansport, evaluated A.J.[17] In his report dated September 24, 2009, Dr. Morris concluded that A.J. was incompetent to stand trial, but recommended that A.J. remain at Logansport "for further treatment and evaluation, continued competency restoration efforts, an[d] initiation of Regular Commitment proceedings." Respondent's Ex. B at 6. Approximately two weeks later, Logansport filed its petition to initiate the regular commitment proceedings at issue in this appeal. Attached to the petition was the "Physician's Statement" prepared by Dr. Thompson, another employee of Logansport and A.J.'s treating psychiatrist, in which Dr. Thompson concluded that Logansport was the only suitable treatment facility for A.J.

One year later, at the September 29, 2010 hearing on Logansport's petition for involuntary commitment, Dr. Morris opined that there is a "very good possibility" that A.J. will attain competency. Tr. pp. 38–39. There was no independent psychological evaluation of A.J. obtained for this hearing, only the evaluation of Dr. Morris. Thus, aside from Dr. Masbaum's and Dr. Berger's initial competency evaluations, the only evidence available to the trial court and to us regarding the likelihood that A.J. will ever attain competency is Dr. Morris's evaluation of A.J. after he began receiving competency restoration services.

Assuming that A.J. ever attains competency, the resolution of the pending criminal charges will likely turn on whether, at the time of the alleged acts of molestation, A.J.'s mental disease was such that he cannot be held criminally responsible for his actions. This is where defendants like A.J. fall into Indiana's twin "black holes" of incompetency to assist defense counsel and competency restoration services. As I explained in my concurring opinion in *Habibzadah*,

> [a] large and ironic lapse in the logic of our criminal justice system is that its initial imperative is to determine the competency of defendants prospectively, to assist counsel at trial. And the courts can determine whether the defendant is able to assist in his or her own defense at any time, whether relatively soon after arrest, or long thereafter, sometimes years after arrest. Only after a defendant is determined competent is the issue of competency at the time of the crime raised, and only along with the trial of the facts of the offense alleged.
>
> The problem arises that if a defendant is not competent to assist in his or her own defense, under our current system, the defendant will never be able to go to trial and present evidence relating to his or her culpability at the time of the crime. . . . [Especially] troublesome is the possibility of a defendant who regains competency during civil commitment over a period of decades. It is quite likely that such a person will have no memory of the crime charged and be horrified upon learning of it. Even worse, that defendant might then be convicted for the underlying crime, in part because his demeanor is now that of a competent person.

* * *

Our criminal justice system needs an earlier and intervening procedure to determine competency retroactively to the time of the alleged crime. Perhaps we as a society need to consider the concept of a defendant being *unchargeable* because of mental illness under Indiana

---

17. Apparently, Dr. Morris also evaluated A.J. in July, 2009, approximately two months into A.J.'s commitment. This evaluation has not been included in the record.

Code section 35–41–3–6, and not just guilty but mentally ill under Indiana Code section 35–36–2–1, *et. seq.* In either case, the commitment proceedings provided for in Indiana Code section 35–36–2–4 would both protect society and best care for the defendant involved.

Whether such a procedure is promulgated by the Indiana Supreme Court through its rule-making process or by the Indiana General Assembly through statute, it is time for the truly long-term, incompetent criminal defendant to have an earlier and intervening opportunity for a determination of his or her competency at the time of the crime alleged. Such a procedure convened soon after arrest, rather than years later when stale evidence and dim or non-existent memories are all that are left, or never, would best serve society and the defendant.

904 N.E.2d at 370–71

All of these concerns are compounded in a case where, despite the earliest expert opinions received closest to the time of the alleged criminal act, evidence which then established that A.J. will *never* attain competency, A.J. has been shunted off to competency restoration services at Logansport and held there for over two years. A.J.'s family has worked hard to try and create a safe, community-based alternative for his treatment, but in the face of the position of Logansport's physician that Logansport is the only suitable facility for A.J., A.J. will likely remain there for years, if not for a lifetime.

There are no simple answers in the treatment of chronic mental illness, whether in a criminal or civil context, but A.J.'s case is an example of an area where the law must do better.