**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 16 2013, 10:22 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**ROBERT A. GRUBBS**
Grubbs Law Office
Fort Wayne, Indiana

ATTORNEY FOR APPELLEES:

**JEFFREY L. LUND**
Yoder, Ainlay, Ulmer & Buckingham, LLP
Goshen, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

DAVID X. FINLEY and )
DIANE M. FINLEY, )
 )
 Appellants-Plaintiffs, )
 )
 vs. ) No. 02A03-1302-PL-48
 )
FIRST FEDERAL SAVINGS BANK and )
CHARLESTON AUCTIONEERS, INC., )
 )
 Appellees-Defendants. )

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable David J. Avery, Judge
Cause No. 02D01-1012-PL-452

**December 16, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

David X. Finley and Diane M. Finley (collectively, "the Finleys") appeal from the trial court's order entering judgment in favor of First Federal Savings Bank ("First Federal" or "the Bank") on the sole issue presented at the bench trial, namely, whether a commercial security agreement executed by Your Entertainment Solutions, Incorporated ("YES"), a closely held corporation, whose officers were the Finleys, conferred upon First Federal the legal entitlement to take possession of any of YES's inventory for the purpose of liquidation of the inventory so that the proceeds could be applied to the Finleys' indebtedness to First Federal. The Finleys contend that the trial court erred by finding that (1) the commercial security agreement and commercial guaranty survived a Settlement Agreement entered into between the Finleys and First Federal, (2) that First Federal could seize assets when the Finleys were current on their payments to First Federal, and (3) that the matter could proceed to the jury trial portion of the bifurcated trial.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On February 21, 2007, the Finleys executed a promissory note to First Federal in the principal amount of $707,000.00 ("Note 1"). Note 1 was secured by a mortgage and assignment of rents on 10316 Maysville Road, Fort Wayne, Indiana ("Maysville Road Property") a mortgage and assignment of rents to First Federal on real property located at 2001 Sycamore Hills Drive, Fort Wayne, Indiana, the personal residence of the Finleys ("Personal Residence") and certain life insurance policies with Northwestern Mutual Life Insurance Company. This note was also secured by a commercial guaranty executed by YES on February 21, 2007, in which YES guaranteed the payment of the Finleys'

2

indebtedness to the Bank. Also on February 21, 2007, the Finleys executed a second promissory note to the Bank in the principal amount of $143,000.00 ("Note 2"). Note 2 represented a line of credit from the Bank that was secured by the same security documents that secured Note 1 and was also secured by a commercial guaranty executed by YES.

On May 25, 2007, YES and the Bank entered into a business loan agreement and an application and agreement for an irrevocable line of credit with Sony as the beneficiary and a Commercial Security Agreement, which was backed up by a $50,000.00 line of credit. The security agreement granted the Bank a security interest in all of YES's inventory, chattel, paper, equipment, and general intangibles and included a cross-collateralization provision by which YES agreed that the commercial security agreement secured all obligations, debts, and liabilities of YES to the Bank, including YES's commercial guaranty of the Finleys' indebtedness to the Bank. YES also agreed that David Finley would pledge two of his life insurance policies with Northwestern Mutual Life Insurance Company and that the Finleys would each execute a guaranty as security for the financial obligations of YES, Inc.

Also on May 25, 2007, the Bank, the Finleys and YES executed the following:

a. A promissory Note ("Note 3") by which YES, Inc. promised to pay the Bank the principal amount of advances up to the sum of $50,000.00 and interest. Note 3 was a line of credit from the Bank to the Finleys for the purchase of electronic goods from Sony Electronics.
b. YES's Corporate Resolution to Borrow/Grant Collateral/Subordinate Debt.
c. YES's Collateral Security Agreement giving the Bank a security interest in YES's collateral.

3

d. Two Commercial Guarantys executed by David Finley and Diane Finley, guaranteeing YES's indebtedness to the Bank.

On September 7, 2007, the Bank filed a UCC Financing Statement with the Secretary of State of Indiana, for the collateral consisting of inventory, chattel paper, accounts, equipment and general intangibles.

On or about January 21, 2008, the Bank, on behalf of YES, wired the sum of $50,000.00 to Sony Electronics a Letter of Credit for the sum of $50,000.00 pursuant to the Letter of Credit issued by the Bank. The Bank debited the $50,000.00 paid to Sony Electronics from the Finleys' line of credit funded by Note 2. In October 2008, YES ceased operations. The personal property from the Covington location was moved to the Maysville Property.

On April 17, 2009, the Finleys executed a Promissory Note ("Note 4") by which they promised to pay the Bank the principal amount of $140,878.19. Note 4 constituted the payment of Note 2 and was secured by the same collateral pledged by the Finleys on February 21, 2007. The note was also secured by the commercial guaranty executed by YES on February 21, 2007. The Finleys failed to make payments on Note 1 and Note 4. YES failed to make payments as required by the commercial guaranty and on April 20, 2010, the Bank filed a lawsuit against the Finleys and YES in Huntington County.

On May 25, 2010, the Bank and the Finleys executed a Settlement Agreement to resolve the Huntington County litigation. Pursuant to the Settlement Agreement, the Finleys agreed to deliver to the Bank a deed in lieu of foreclosure for the Maysville Property in satisfaction of Note 1, that the balance due on Note 4 as of June 1, 2010 was

4

$137,000.00 and that Note 4 would continue to be secured by the second Mortgage on the Residence and the Assignment of Rents from the Residence and that the Finleys would execute a new Promissory Note ("Note 5") in the sum of $100,000.00 dated June 1, 2010, which would be secured by a third mortgage on the Residence.

Also, on May 25, 2010, the Finleys executed a deed in lieu of foreclosure for the Maysville Property. On June 1, 2010, the Finleys executed a Promissory Note ("Note 6") in the amount of $137,000.00. Note 6 is secured by a Mortgage on and the Assignment of Rents from their residence.

On June 24, 2010, the Bank took possession of the Maysville Road Property. The property contained audio and video equipment which the Bank believed to be collateral pledged by YES in the Commercial Security Agreement executed on May 25, 2007. In correspondence dated June 28, 2010, counsel for the Bank informed the Finleys' counsel that personal property was being stored in the Maysville Road Property and requested that the Finleys contact the Bank regarding the property

The Bank and the Finleys filed a Joint Stipulation for Dismissal Without Prejudice which Stipulation states, in part, that "the issues once disputed have been resolved to the satisfaction of the Parties", and on March 23, 2011, the Huntington Circuit Court issued an Order dismissing, without prejudice, the Bank's claims against the Finleys. The Order made no reference to the Bank's claims against YES.

On September 9, 2010, the Bank contracted with Charleston Auctioneers, Inc. ("Charleston") to auction the personal property located at the Maysville Road Property.

5

The Bank intended to apply the proceeds to Note 3 owed to Bank by the Finleys. Subsequently, on October 12, 2010, counsel for the Bank sent another letter to the Finleys' counsel concerning the auction of the property and requesting the Finleys' guidance as to whether the auction should proceed. Ultimately, on October 23, 2010, Charleston conducted the auction of the personal property at the Maysville Road Property, netting $20,688.83 which the Bank intended to be applied to reduce the balance due and owing on Note 3.

On December 28, 2010, the Finleys filed a complaint against the Bank and Charleston alleging that the two had converted personal property owned by the Finleys. By agreement of the parties, the trial court bifurcated the case, trying certain issues to the bench and others to the jury.[1]

At the conclusion of the bench trial, the trial court determined that YES's commercial guaranty survived the Settlement Agreement, and the Bank was legally entitled to take possession of YES's inventory for the purpose of liquidating the inventory and applying it to the Finleys' indebtedness to the Bank. The Finleys filed a motion to correct error, which the trial court granted in part and denied in part. The matter then proceeded to a jury trial to determine if the Finleys owned the property at issue. At the conclusion of the jury trial, the jury reached a verdict in favor of the Bank and Charleston. The Finleys now appeal.

---

[1] The issues we are asked to decide in this appeal challenge the rulings made by the trial court in the bench trial phase of this action. As such, we do not have before us the record of the jury trial phase and, thus, are not asked to review the jury's verdict and judgment. We are asked only if the matter should have proceeded to the jury trial phase, and if not, to reverse and remand the matter for a new trial.

## DISCUSSION AND DECISION

The bench trial phase of the matter involved the Bank's affirmative defenses among which was accord and satisfaction. Accord and satisfaction is an affirmative defense, and as is the case with other affirmative defenses, the party asserting the defense bears the burden of proof. *Fifth Third Bank of Se. Ind. v. Bentonville Farm Supply, Inc.*, 629 N.E.2d 1246, 1249 (Ind. Ct. App. 1994). Therefore, because the Bank was asserting an affirmative defense, the Bank bore the burden of proof. Because the Finleys did not prevail at the bench trial phase of this matter, the adverse judgment standard of review applies to their claims. "[A]n adverse judgment is one that was entered against a party defending on a given question i.e., one that did not bear the burden of proof." *Romine v. Gagle*, 782 N.E.2d 369, 376 (Ind. Ct. App. 2003) (citing *Garling v. Ind. Dep't of Natural Res.*, 766 N.E.2d 409, 410 (Ind. Ct. App. 2002)). "When the trial court enters findings in favor of the party bearing the burden of proof, we will hold the findings clearly erroneous if they are not supported by substantial evidence of probative value." *Garling*, 766 N.E.2d at 411. "Even if the supporting evidence is substantial, we will reverse the judgment if we are left with a definite and firm conviction a mistake has been made." *Id.*

In their complaint, the Finleys alleged that the Bank and Charleston had exerted unauthorized control over the Finleys' property. As such, the Finleys bore the burden of establishing their entitlement to and ownership of the property. That issue, however, was for the jury trial phase of the matter. The Bank and Charleston filed an answer and affirmative defenses to the complaint arguing that they had a security interest in that property arising from the cross-collateralization provision of YES's commercial security

7

agreement with the Bank. After conducting the bench trial on this issue, the trial court found that the commercial security agreement survived the Settlement Agreement entered into between the Finleys and the Bank. Thus, in the trial court's opinion, to the extent the property belonged to YES, the Bank had a valid secured interest in any property owned by YES, who was a guarantor of the indebtedness.

The Finleys and the Bank were the only parties to the Settlement Agreement. YES was a named defendant, along with others, in the Bank's mortgage foreclosure complaint. Although both the Finleys and the Bank were aware that YES had ceased operations, it appears that neither side considered YES's interests and commitments when the Bank and the Finleys entered into the Settlement Agreement. Diane Finley was the sole shareholder of YES and both Finleys were officers of YES, but they signed the Settlement Agreement in their individual capacities only. There was no evidence in the record to show that there was a winding down of YES's business. Instead, YES ceased its operations at its store at Covington Plaza and consolidated its operations at the Maysville Road Property by moving the inventory to the Maysville Road Property. The Finleys created a business plan, which was shared with the Bank, to conduct business as "YES, Say Yes to FiOS," a home theater agent for Verizon FiOS. The Finleys moved and transferred the inventory to Say Yes to FiOS, and there was no bill of sale supporting the transfer of the inventory. In the business plan, David Finley stated that "[w]e have closed our store at Covington Plaza and have consolidated our operations at the Chapel Ridge location—the building that we personally own. We currently have approximately $90,000 in inventory and will be lucky to get $80,000 out of it." *Appellants' App*. at 159. At the bench trial, Thomas Mills, the Senior

8

Vice President in charge of commercial lending at the Bank, testified that he was aware that YES was no longer doing business, but was not certain whether YES was still in existence. *Tr.* at 86. The Bank's focus during the negotiations leading up to the Settlement Agreement was on receiving the Deed in Lieu of Foreclosure. To the Bank's knowledge, based upon David Finley's representations, YES was not doing business and did not appear to have assets. *Id.*

The trial court's analysis of the transactions entered into by the Finleys and the Bank was based in terms of accord and satisfaction of the Finleys' old indebtedness. Accord and satisfaction is described as follows:

> Accord and satisfaction is a method of discharging a contract, or settling a cause of action by substituting for such contract or dispute an agreement for satisfaction. The term "accord" denotes an express contract between two parties by means of which the parties agree to settle some dispute on terms other than those originally contemplated, and the term "satisfaction" denotes performance of the contract. As a contract, accord and satisfaction requires a meeting of the minds or evidence that the parties intended to agree to an accord and satisfaction. Under Indiana Trial Rule 8(C), accord and satisfaction is an affirmative defense which must be specifically pleaded and proven by the party raising it. The question of whether the party making the defense has met its burden is ordinarily a question of fact but becomes a question of law if the requisite controlling facts are undisputed and clear.

*Mominee v. King*, 629 N.E.2d 1280, 1282 (Ind. Ct. App. 1994) (internal citations omitted).

The trial court found that the Settlement Agreement acted as an accord of Note 1 and that satisfaction of Note 1 occurred when the Finleys executed and delivered the Deed in Lieu of Foreclosure and executed Notes 5 and 6. Notes 5 and 6 were to be paid in full on June 13, 2013, the date accord and satisfaction would be completed, in the event that the Finleys made the required payments and the parties did not renegotiate the obligations.

9

YES's commercial security agreement gave the Bank a security interest in YES's inventory. However, as the trial court noted, the agreement was given primarily as security for Note 3, the Letter of Credit to Sony, which was never used and on which no indebtedness occurred. That security agreement stated as follows in the provision granting a security interest to the Bank:

> For valuable consideration, Grantor [YES, Inc.] grants to Lender a security interest in the Collateral to secure the Indebtedness . . . .

*Pl. Ex.* 63 at 845. The commercial security agreement further defined indebtedness as follows:

> Indebtedness. The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, indebtedness includes the future advances set forth in the Future Advances provision, together with all Interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

*Id*. at 850.

The cross-collateralization provision of the commercial security agreement further provides:

> In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

10

*Id.* at 845. The commercial guaranty also stated that if YES elected to revoke the guaranty, it "may only do so in writing," with written notice being sent to First Federal by certified mail. *Appellants' App.* at 120. YES never revoked the commercial guaranty.

The commercial security agreement also created obligations on YES regarding the location of the inventory, provision of a schedule of the property, and removal of the property among other things. It also established that upon default, the Bank had certain rights to YES's inventory including the right to take possession of the collateral. The commercial security agreement also defines default to include when "Grantor [YES] fails to comply with or to perform any other term, obligation, . . . contained in this Agreement . . . or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor." *Pl. Ex.* 63 at 847.

The Finleys claim that the trial court erred by failing to consider extrinsic evidence in making its decision. However, as the Bank notes, the trial court reviewed all of the documents and considered testimony offered by both sides about the documents and transactions. In doing so, the trial court found that the Finleys were current on their payments at the time of the auction, and that the Finleys did not execute any security agreements that gave the Bank any security interest in the personal property for the Finleys' financial obligations arising from Notes 1, 2, 4, 5 and 6. However, because the Finleys admitted they were in default and reached an agreement with the Bank in the mortgage foreclosure action culminating in the Settlement Agreement, and YES did not fulfill its obligations vis-à-vis its guaranty of the Finleys' indebtedness upon their default, YES was in default as it was defined in the commercial security agreement, and the Bank was entitled

11

to take possession of YES's inventory for application to the Finleys' indebtedness.

This court's opinions in *TW General Contracting Services, Inc. v. First Farmers Bank & Trust,* 904 N.E.2d 1285 (Ind. Ct. App. 2009) and in *Houin v. Bremen State Bank*, 495 N.E.2d 753 (Ind. Ct. App. 1986) support the trial court's resolution of the issues presented during the bench trial. In *TW*, the borrower, a corporation we will call TW, delivered two notes to the lender, First Farmers, in 2005, which did not mention any guaranties. On the same day, two identical guaranties were offered to the lender, one signed by the Taylors, and the other signed by the Wendorfs. After the guaranties were executed, TW renewed the notes and delivered two new notes to the First Farmers in 2007, again without mention of the guaranties. In 2008, the lender filed a complaint against TW and the guarantors alleging that TW had defaulted on the notes. After the lender's motion for summary judgment was granted by the trial court, with a judgment entered in favor of the lender for $387,594.73, the guarantors appealed.

The guarantors argued that the renewed note and the two new notes materially altered their guaranties and were not contemplated when the guaranties were executed. A panel of this court held that expansive language of the guaranties made the guarantors liable for the judgment. 904 N.E.2d at 1290. Those guarantors "offered their absolute and unconditional Guaranties to the Lender to 'induce' it to make loans to TW 'at any time.'" *Id*. TW's liabilities which were covered by the guaranties included "'each and every debt, liability and obligation of every type and description' that TW made or 'hereafter created.'" *Id*. Further language provided that the guaranties were "'absolute, unconditional and continuing' and would 'continue to be in force' and binding 'whether or not all

12

Indebtedness is paid in full' until 'revoked by written notice actually received' by the Lender.'" *Id*. The guaranties provided no end date, and the liability was described as unlimited. *Id*.

Here, YES's commercial guaranty provided under the section entitled "CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE" that "For Good and valuable consideration, [YES] absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of [the Finleys], or any one or more of them, to Lender, and the performance and discharge of all [the Finleys'] obligations under the Note and Related Documents." *Appellants' App*. at 120. Under the heading "INDEBTEDNESS" the term was defined as "all of the principal amount outstanding from time to time and at any one or more times, accrued, unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that [the Finleys] individually or collectively or interchangeably with others, owes or will owe Lender. 'Indebtedness' includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of [the Finleys], or any one or more of them, and any present or future judgments against [the Finleys], or any one or more of them, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute theses debts, liabilities and obligations. . . ." *Id*.

13

Further, the commercial guaranty provided that it would "take effect when received by Lender . . . and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of [YES's] other obligations under this Guaranty shall have been performed in full." *Id.* We conclude that the "new indebtedness" entered into pursuant to the Settlement Agreement could not be "characterized as material alterations but rather as a logical continuation of the mutually beneficial lender-borrower-guarantor arrangement." *TW General Contracting Servs., Inc.,* 904 N.E.2d at 1290.

In *Houin*, a guarantor executed a continuing guaranty in favor of the lender in 1975, in which the guarantor guaranteed the present and future indebtedness of the debtors, the guarantor's daughter and son-in-law. After executing the guaranty, the debtors obtained loans to finance their farming operation. In 1976, the guarantor orally notified the lender that he wanted no more money to be loaned to the debtors. However, in 1979, a new promissory note for $94,255.03 was executed by the debtors, and they subsequently defaulted on the note. The lender filed an action to collect on the note against the debtors and the guarantor. The debtors received $30,000.00 from the Farmers Home Administration and entered into a settlement agreement and compromise with the lender for the payment of that $30,000.00. The lender issued a new note and dismissed the lawsuit without prejudice without advancing new funds. The debtors filed for bankruptcy protection, and the debt was discharged as to them. The lender filed suit against the guarantor and the trial court entered judgment in favor of the lender in the sum of $163,789.15.

14

The guarantor appealed contending that a material alteration occurred when the lender entered into a settlement and compromise with the debtors and dismissed the first lawsuit. A panel of this court rejected the guarantor's argument and found that the compromise was not a full and final compromise because a new note was executed by the parties; therefore, the guarantor remained liable. 495 N.E.2d at 760.

Here, YES absolutely and unconditionally guaranteed the present and future indebtedness of the Finleys. Unlike in *Houin*, the Finleys did not attempt an oral revocation of YES's commercial guaranty, which would not have been sufficient anyway. The Finleys defaulted on their obligations, and the Bank filed an action to collect on the debt against the Finleys and YES. The Bank and the Finleys entered into a Settlement Agreement, which resulted in the dismissal without prejudice of the claim. The Settlement Agreement resulted in two new promissory notes, with no new funds being advanced. As in *Houin*, this did not result in a material alteration of YES's liability, but rather was a logical continuation of the arrangement, wherein YES, who not a party to the Settlement Agreement, remained liable.

The Finleys also point to Indiana Code sections 23-1-45-5 (continuance of corporate existence and winding up of affairs) & -6 (disposition of known claims) and Indiana Code section 23-1-46-2 (administrative dissolution and winding up of affairs) to support their argument that YES was dissolved at the time of the Settlement Agreement. However, the Finleys do not support their argument with citation to any portion of the record in support of this contention. In fact, there was no evidence showing that there was a winding up of affairs or that articles of dissolution had been filed. Further, dissolution of a corporation

15

does not transfer title to the corporation's property.  Ind. Code §23-1-45(b)(1).

Although at the time of the auction the Finleys were current on their payments for the new notes entered into as a result of the Settlement Agreement, the record reflects that they had defaulted on the original promissory notes and that YES, the guarantor, did not fulfill its obligations under the commercial guaranty.  Thus, YES was in default of its guaranty, and First Federal was entitled to seize YES's assets discovered at the Maysville Property.  While the Finleys may challenge the timing of First Federal's seizure of those assets, the record reflects that David Finley first informed the Bank that YES was ceasing operations and moving the inventory estimated in value at approximately $80,000.00 to $90,000.00, to the Maysville Property,[2] and then informed First Federal during settlement negotiations that there were no remaining assets of YES.  The record reflects that First Federal began communications with the Finleys upon taking possession of the Maysville Property and discovering what it believed to be inventory of YES.  This evidence would explain the timing of the Bank's actions.  That said, by the express terms of the commercial security agreement, it "**continue[d] in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time [YES] may not be indebted to [First Federal]**.  *Appellants' App*. at 128 (emphasis in bold in original).  Thus, even though the Finleys were current on their payments at the time of the auction, the default by the Finleys and YES, had already occurred, and First Federal was entitled to seize YES's collateral.

---

[2]  Moving the inventory without the Bank's consent would establish a default under the commercial guaranty.  There is no evidence that the Bank consented.

Therefore, the trial court correctly concluded that the commercial security agreement and the commercial guaranty survived the Settlement Agreement. The trial court also correctly concluded that even though at the time of the auction the Finleys were current in their payments, the agreements in place, did authorize First Federal to seize YES's inventory. Therefore, the only issue left was for the jury in its fact-finding role is to determine ownership of the property that had been sold at auction. The trial court did not err in allowing the matter to proceed to the jury trial phase of the bifurcated trial.

Affirmed.

ROBB, C.J., and RILEY, J., concur.